STATE of Missouri, Respondent,

v.

George B. HARRIS, Appellant.

No. 73011.

Supreme Court of Missouri,
En Banc.

Feb. 22, 1994.

As Modified on Denial of Rehearing
March 22, 1994.

---

Susan M. Hunt, Kansas City, for appellant.

Jeremiah (Jay) Nixon, Atty. Gen., Breck Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERTSON, Judge.

A jury convicted George Harris of murder in the first degree and armed criminal action and recommended that Harris be sentenced to death. The trial court overruled his Rule 29.15 motion. This direct appeal followed. We have jurisdiction. Mo. Const. Art. V, § 3. Affirmed.

### I.

■ We review the facts in the light most favorable to the verdict. *State v. Guinan,* 665 S.W.2d 325, 327 (Mo. banc 1984).

George Bernard "Baby" Harris hit a lucky streak on the morning of March 11, 1989. He won some money shooting craps. In fact he won enough money that people noticed it and figured he had a little to spare. A man who needed money asked Harris to let him "pawn" two machine guns, an Uzi and a .45 caliber Thompson automatic machine gun. Harris agreed, gave the man $500 in return for the machine guns and took them to the trunk of his car.

Harris walked back toward the crap game, worried that someone would steal the guns from his car. When he saw Michael Taylor, he asked Taylor if Taylor would keep the machine guns for him. When Taylor agreed, Harris followed Taylor to Taylor's house at 2741 Chelsea. Taylor shared the house with Rodney Butler, Ross Talliferro and Stanley "Hank" Willoughby. When Harris arrived, Taylor asked Willoughby to come down to Harris' car. Harris spoke with Willoughby, removed a box containing the machine guns from the trunk and handed it to Willoughby. Willoughby walked toward the house with the weapons. Rodney Butler, who was sitting on the porch, asked Willoughby not to bring the guns in the house. Willoughby handed the box containing the machine guns to Cortez and Anthony Taylor, Michael Taylor's younger brothers. Willoughby told the boys to hide the guns somewhere near the house. Harris left. Cortez and Anthony took the box from Willoughby and hid it under some bushes in the backyard. The young Taylors left without telling Willoughby where they had hidden the guns.

At about 8:00 p.m., Harris returned looking for Michael Taylor. Butler answered the door and indicated that Taylor was upstairs sleeping. Harris went upstairs and told Taylor he had come to pick up the guns. When Taylor told him that he did not know where the guns were, Harris insisted that he needed them right away. At some point during the day Harris had suffered the grave injustice of being called a "punk" and told Taylor that he was going to do a "drive-by" shooting to show "them" that he was not a punk. Taylor told Harris to ask Willoughby about the machine guns when Willoughby returned from "picking up some girls."

Harris went downstairs. Taylor stayed in bed. Some time later, Harris yelled for Michael Taylor to come downstairs. When Taylor came down, he found Harris and several other people downstairs including Willoughby, Ross Talliferro, Delmar Hatcher, Deonna Jacobs, an "Ingrid" and Jarlath Potts.

Harris asked Taylor for his guns. Taylor again told Harris to ask Willoughby. Willoughby explained that he did not know where the guns were because Anthony and Cortez Taylor had hidden them. Harris insisted that he wanted his guns and that he wanted them now. Willoughby went outside to look for the guns. Harris was heard to say, "I'm going to kill that nigger." Talliferro, Hatcher and the two girls went upstairs. Five minutes later, Willoughby returned without the guns. Butler left to look for them.

At this point, there were only three people remaining in the living room area: Michael Taylor, George Harris and Hank Willoughby. Willoughby told Harris that if he wanted his guns, he would have to wait until Anthony and Cortez came back. Harris insisted on getting his guns right away. Willoughby said, "Well, I can't help you." Harris got up from the chair, pulled a .41 caliber Ruger Blackhawk magnum revolver from his waistband, and shot the victim in the lower face and neck. The bullet passed through Willoughby's carotid artery. Willoughby staggered next door to 2739 Chelsea to Michael Taylor's mother's house and collapsed on the steps. A few minutes later, some of the occupants at 2741 Chelsea went out to call an ambulance and the police. Meanwhile, Butler arrived with the guns, placed them on the porch at 2739 and ran inside.

Harris took the guns and drove away, ultimately making his way to Sabrina Lowe's apartment. From there, Harris and Lowe went to the Champagne Lounge looking for a man named "Rudi". Harris told Lowe he intended to kill Rudi and had bought the machine guns for that purpose.

Willoughby died before he reached the hospital.

Law enforcement officials arrested Harris in Columbia, Missouri, on March 15, 1989, after Harris and others had committed an armed robbery there.

At trial, the jury found Harris guilty of the first degree murder of Stanley "Hank" Willoughby, found five aggravating circumstances and recommended that Harris be put to death. This appeal followed. For the sake of a more coherent presentation of the discussion of Harris' points on appeal, we consider those points as the allegations of error relate to the order of trial.

## II.

Harris' brief sets out five points of error relating to jury selection.

## A.

First, Harris claims that the trial court erred when it sustained the state's challenges for cause to venirepersons Gold, Thomas and Velasquez. Harris claims that elimination of these members of the venire panel, who expressed "conscientious scruples" (appellant's brief) about the death penalty, violated his right to a fair and impartial jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

■ In *Wainwright v. Witt*, 469 U.S. 412, 416, 105 S.Ct. 844, 848, 83 L.Ed.2d 841 (1985), the Supreme Court held that a capital defendant's right to trial by a fair and impartial jury is violated when a trial court excuses members of the venireperson for cause merely because they express conscientious objections to capital punishment. However, *Witt* makes it clear that a venireperson can be removed for cause in a capital case if the venireperson's views would prevent or substantially impair his or her ability to perform the duties as a juror in accordance with the instructions and oath. *Id.*, 469 U.S. at 425–26, 105 S.Ct. at 853–54.

■ The trial court possesses broad discretion in determining whether a prospective juror is prepared to give both the defendant and the state a fair trial and consider the full range of punishments the law permits if the defendant is found guilty.

What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with a definite impression that a prospective juror would be unable to faithfully and impartially apply the law ... [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Witt*, 469 U.S. at 424–26, 105 S.Ct. at 852–54. The trial court's ruling on a challenge for cause will not be disturbed on appeal unless it constitutes a clear abuse of discretion and results in a genuine probability of injury to

the complaining party. *State v. Feltrop,* 803 S.W.2d 1, 7 (Mo. banc 1991).

■ As to venireperson Vivian Gold, the record shows that she stated several times that she opposed the death penalty and that she could not realistically consider imposing the death sentence. After repeated questioning she said she could consider the death penalty, but then she stated that she did not think she could sign a death verdict. The state challenged Ms. Gold for cause and the trial court sustained that challenge.

We find no abuse of discretion in the trial court's decision. Through questioning, the state demonstrated that Ms. Gold's views would prevent or substantially impair her ability to properly perform her duties as a juror.

■ Patricia Thomas gave inconsistent answers, which led the court to conclude that her views would substantially impair the performance of her duties as a juror. She first stated that she could not think of any circumstances in which she would choose death over life as a punishment. Then she repeatedly stated that she just did not know whether she could impose the death penalty on account of her moral beliefs. Under further questioning, she tentatively stated that she could consider both the alternative of life without parole and death.

The prosecutor challenged Thomas for cause and, on the basis of her demeanor and inconsistent answers, the court sustained the challenge for cause. There is ample support in this record for the trial court's conclusion that Ms. Thomas would be "unable to faithfully and impartially apply the law." *Witt,* 469 U.S. at 426, 105 S.Ct. at 853.

■ Ms. Velasquez displayed a similar pattern of equivocation to that expressed by Ms. Thomas. In addition, she stated she did not know if she could keep an open mind about the death penalty, that she would require 100 percent proof of guilt, and would have to be absolutely sure. The trial court concluded that she would not be able to perform her duties as a juror.

We find no abuse of discretion in the trial court's decision to sustain the challenge for cause to Ms. Velasquez.

**B.**

■ Harris next contends that the trial court erred when it overruled his challenge for cause to venireperson Marilynn Hentz. He alleges that Ms. Hentz expressed bias in favor of the death penalty and her answers under questioning show that her views would have impaired her ability to perform her duties. Ms. Hentz did not serve on the jury; Harris used a peremptory challenge to remove her. Appellant did not raise this claim in a motion for new trial and did not preserve this point for appeal. Review is for plain error. Rule 30.20.

We have reviewed the record and are not convinced that manifest injustice or a miscarriage of justice resulted from the trial court's decision to overrule Harris' motion to strike Ms. Hentz for cause. The point is denied.

**C.**

■ Harris alleges that the trial court erred when it failed to quash the initial group of six venirepersons because the prosecutor said during voir dire:

Mr. Peters: The State must show to you beyond a reasonable doubt one statutory aggravating circumstance. And because of the way it's set up, we can't discuss that yet. Unless we show you that one aggravating circumstance, you can't even consider the death penalty. I think it's safe to say that we would be able to meet that burden.

Mr. O'Connor: Judge, I'm going to object to that. I think that's totally improper at this point to say what they intend to prove.

The Court: That will be sustained.

Mr. O'Connor: I ask the jury to disregard it, the six panel members, the comments.

Mr. Peters: Judge, I don't believe it's improper because if I don't believe that, we can't even go ahead with this proceeding.

Mr. O'Connor: That even makes it more of an objection because it's a personal statement to the jury, and the statement is improper.

The court: Yes. The objections are sustained. ***The jury is to disregard those matters.*** I've already given that instruction.

[Emphasis added.] The trial court denied Harris' counsel's motion to quash the six jurors on the panel and, eventually, two of the jurors served on the jury panel. Harris argues that sustaining the objection was insufficient to cure the prosecutor's prejudicial statements because the jury was informed of Harris' guilt and eligibility for the death penalty before it was impaneled and before it even heard any evidence.

The critical issue this point raises is whether the trial court's admonition to the panel to disregard the prosecutor's statement sufficiently responded to the potential for prejudice the statement may have raised. Harris, of course, insists that the trial court should have declared a mistrial. We disagree.

Taken on their face, the prosecutor's remarks are a less than artful attempt to inform potential jurors of the process that lies before them. Discretion should have suggested to the prosecutor that he went too far. When the prosecutor's judgment failed, the trial court stepped in and imposed the time-honored remedy of admonishing the panel. In this case, the admonition was sufficient. The prosecutor had not entered into a discussion of the details of the evidence. We believe Harris' counsel's quick objection and the trial court's prophylactic comments sufficiently cured the potential prejudice.

### D.

 Harris claims that the trial court committed plain error during the following exchange during voir dire:

[Mr. O'Connor:] Does the fact that just briefly that Mr. Peters told you that he was seeking the death penalty mean to anyone here that this man must be guilty because they're seeking the death penalty?

[Mr. Peters:] Your Honor, I'm going to object to the form of the question. It's by statute that this man is held accountable for the death penalty. ***Mr. Peters has no role in seeking the death penalty.***

[Mr. O'Connor:] I apologize. I'm just saying the fact they've asked for the death penalty, Mr. Peters has asked you to state—

[The Court:] Yes. ***It's the statute that requires it.*** If he's charged with first degree murder, that's automatically to be considered.

[Emphasis added.] Harris contends that these statements misled the jury into believing the death penalty was the mandatory punishment in this cause. Since Harris did not object, we review for manifest injustice or miscarriage of justice, Rule 30.20, and finding that no prejudice resulted from these comments, we reject Harris' point.

### E.

Finally, Harris claims that during voir dire the state made a potpourri of misstatements about the death penalty, the cumulative impact of which was to deprive him of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Harris claims the state "kept stating that the death penalty was required." Harris does not provide a citation to this statement in the record beyond that addressed at II, D. For the reasons previously discussed, we find this point is without merit.

 Second, Harris claims that the prosecutor's statement that "the decision is in the accused's hands, not the jury's" violates his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and that it also violates Article I, Sections 10 and 18(a) of the Missouri Constitution.

The comments cited by Harris follow Harris' counsel's statement that, "You're aware that *life or death is in each individual's hands.*" In response, the prosecutor said, "The jury determines whether [defendant's] actions warrant it. It's not that the jury gives the death sentence."

Seen in context, the prosecutor made a general statement regarding taking responsibility for one's actions. These statements were meant to suggest that individual jurors voting for the death penalty were not them-

selves killers. We find no error in the trial court's ruling.

▮▮▮▮ Harris claims that comments and statements made during voir dire caused the court to empanel a jury that was predisposed to impose the death penalty in violation of *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). In *Adams,* the statutory capital sentencing method required jurors to state they would not be "affected" by imposing the death penalty and, thus, the statute provided a broader ground for excluding jurors than that approved by the court in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). *Adams* teaches that jurors who state they can follow the law but who have strong personal opinions about the death penalty cannot be excluded for cause. Harris does not show that any particular prejudicial juror was included or excluded, but instead suggests that the whole atmosphere created by voir dire violated *Adams.* Without more, we cannot discern the gravamen of Harris' complaint. It is denied.

Harris also claims that the scope of questioning on voir dire exceeded the legitimate purpose of "ascertain[ing] probable bias or grounds for incompetency," *Littell v. Bi-State Transit Development Agency,* 423 S.W.2d 34, 37 (Mo.App.1967). The general tenor of his complaint, again, is that the court permitted the state to predispose the jury in favor of the death penalty through the voir dire process. Harris, however, has not shown how any of the comments made during voir dire were sufficient by themselves or taken together to cause the jury to ignore their instructions and vote for the death penalty on some basis other than that provided for in the statute. There is no merit to these contentions.

### III.

Harris' next six points concern alleged error during the guilt phase of trial.

### A.

▮▮▮ Harris asserts that the prosecutor engaged in inflammatory and prejudicial argument when he said in his opening statement:

> Saturday, March 11th, 1989 was killing day for George Baby Harris. The evidence will be that someone was going to die on killing day ...

\* \* \* \* \* \*

The evidence will be that it was killing day, and to that end this man had three weapons. He had a .45 caliber Thompson machine gun ...

\* \* \* \* \* \*

Still killing day. Still has three weapons. The first one is a Thompson .45 caliber machine gun, the machine gun that we're familiar with from *Combat,* from *Elliott Ness,* the gun that rapidly fires .45 caliber bullets. The second gun is the Uzi, developed by Israel for rapid killing, fires nine millimeter bullets, a machine gun. And the third gun that George Baby Harris had was a .41 caliber Magnum revolver, a gun developed to stop a car by breaking the engine block.

\* \* \* \* \* \*

This is a simple case ... because evidence is going to be that what was happening that day is someone unknown had told George Baby Harris, "You're a punk."

\* \* \* \* \* \*

The reason the machine guns were in this man's possession was because someone had called him a punk, and because of that he was going ride down on them, do a drive by.

\* \* \* \* \* \*

The reason that he had the machine guns according to this man was because he was going to ride down on whoever called him a punk.

The state's theory of the case was that Harris purchased the two machine guns with the intent to do a drive-by shooting. When Hank Willoughby, who had agreed to keep the guns for Harris, did not return them, Harris shot Willoughby. After that, Harris went to the Champagne Lounge intending to kill another person.

The state's opening argument laid before the trier of fact the state's theory of the case. The prosecutor spoke dramatically and described Harris with words from which a juror could conclude that Harris was not a nice person and was bent on revenge for a petty personal insult. The evidence admitted at trial substantiated each of the claims made in the opening statement, including the prosecutor's judgments about Harris personally. "References during opening statement to arguably admissible evidence made in good faith with a reasonable expectation that the evidence will be produced are not cause for reversal." *State v. Meanor*, 863 S.W.2d 884, 888 (Mo. banc 1993).

### B.

Harris complains that the trial court erred when it limited his cross-examination of detective Carl Aufner and of Michael Taylor. He claims the trial court denied him his right to confront witnesses guaranteed him by the Sixth and Fourteenth Amendments to the United States Constitution.

Appellant claims he wanted to ask Aufner if he found "baggies" of narcotics at the scene of the shooting. He contends this information was relevant because the house in question was a drug or crack house, that Harris knew this when he went inside, and that it was critical to get this information before the jury to establish Harris' self-defense theory.

Appellant failed to preserve the issue for appellate review. He made no offer of proof at trial as to what Aufner would have said. Without an offer of proof, the issue is not preserved. *State v. Schneider*, 736 S.W.2d 392, 401 (Mo. banc 1987), *cert. denied*, 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988).

Appellant also sought to question Michael Taylor on sales of cocaine, his possession of weaponry, his failure to file income tax returns, as well as what the defense terms "other questions related to credibility." In its offer of proof, the defense established that Taylor had sold cocaine, had possessed guns, had sold drugs from the residence where the victim was shot, and that Taylor knew Harris during the period when these actions took place.

The court allowed defense counsel to inquire about Taylor's past cocaine sales, but refused to allow him to ask if he had possessed guns or if he had sold drugs from the residence where the victim was shot. The court based its ruling in part on the "chilling effect" such testimony would have had on Taylor, since admitting to specific acts would have made Taylor liable for prosecution.

On appeal, Harris challenges the ruling of the trial court. He first claims he needed the jury to hear information to impeach Taylor's credibility. Taylor testified that he had sold cocaine. The trial judge held that, for purposes of impeachment, this admission on Taylor's part was sufficient to discredit Taylor in the eyes of the jury. It is within the sound discretion of the trial court to limit the scope of cross-examination, *State v. Dunn*, 817 S.W.2d 241, 245 (Mo. banc 1991), and to prevent attacks on general credibility on irrelevant matters. *State v. Russell*, 625 S.W.2d 138, 141 (Mo. banc 1981). This Court finds no abuse of that discretion.

Harris also claims Taylor's testimony was relevant to the issue of self-defense. Harris was not charged with shooting Taylor. Whether Taylor possessed guns or sold drugs is not strictly relevant to the issue of whether or not Harris had a reasonable fear of the victim, Willoughby.

In *State v. Waller*, 816 S.W.2d 212, 216 (Mo. banc 1991), this Court changed the rule on admissibility of a victim's prior violent acts. *Waller* held that "[w]here justification is an issue in a criminal case, the trial court may permit a defendant to introduce evidence of the victim's prior specific acts of violence of which the defendant had knowledge." *Id.* Taylor's testimony did not establish that *the victim*, Hank Willoughby, had engaged in violent acts, nor did it tend to show anything that was strictly relevant to the issue of self-defense. Self-defense requires more than a general, nonspecific concern that a locale poses a potential threat because of activities carried on there; it requires a real, specific, actual and immediate threat of bodily violence to which the defen-

dant's actions are an appropriate and proportional response. Taylor's testimony did not offer proof of the specific acts of Willoughby from which Harris could have concluded that he was in danger. The trial court properly limited Taylor's testimony.

### C.

In closing argument, the prosecutor said: Mr. O'Connor told you in his opening statement that, "Mr. Harris will tell you that he knew them to be drug dealers because they are black boys at 27th and Chelsea, he'll tell you that he knew that they were people who had guns. . . ."

■ Harris claims that the trial court's ruling limiting his cross examination of Taylor precluded him from introducing evidence of this fact before the jury. Since neither party is allowed to comment on evidence ruled inadmissible by the court, *State v. Hammonds*, 651 S.W.2d 537 (Mo.App.1983), Harris concludes the prosecutor committed plain error.

Defense counsel failed to object to this comment during the closing argument. The matter is not preserved for appellate review. *State v. McCleskey*, 839 S.W.2d 44, 46 (Mo.App.1992). Our review is limited to determining whether a manifest injustice or miscarriage of justice occurred. Rule 30.20.

The prosecutor's comments do not refer to the failure of Taylor to testify to the presence of drugs or guns in the house. Instead, they go to Harris' own failure to testify about these matters.

On direct examination, Harris never testified to anything regarding Michael Taylor's use of guns or the presence of drugs in the house. On cross-examination Harris testified he had not seen a weapon in the house. When Harris attempted to establish these facts on redirect, he was either unable to do so or failed to do so.

■ The prosecutor's comments were not inappropriate because defense counsel was not prevented from producing this evidence through direct examination of the appellant. The prosecutor's statement discussed what Harris failed to say, not what the defense failed to elicit from Taylor. A prosecutor

may comment on evidence mentioned during opening statement but not produced at trial. *State v. Roberts*, 709 S.W.2d 857, 866 (Mo. banc 1986).

### D.

■ Harris contends that the trial court committed reversible error when it allowed the prosecution to introduce evidence of Harris' other uncharged crimes. The statements to which Harris objects are those made by Michael Taylor and Sabrina Lowe. Taylor testified that Harris needed the guns to do a drive-by shooting, while Lowe testified that Harris went to the Champagne Lounge (after shooting Willoughby) for the purpose of killing Rudi.

■ "The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes." *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). Exceptions to the general rule provide for the admission of evidence that tends to establish motive, intent, the absence of mistake or accident, or a common plan or scheme. *Id.* An additional exception is recognized for evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged. *State v. Wacaser*, 794 S.W.2d 190, 194 (Mo. banc 1990); *State v. Flenoid*, 838 S.W.2d 462, 467 (Mo.App.1992); *State v. Davis*, 806 S.W.2d 441, 443 (Mo.App.1991). This evidence is admissible to present a complete and coherent picture of the events that transpired. *Flenoid* at 467. In this case, the evidence of Harris' planned use of the gun to commit a drive-by shooting was interconnected to and nearly contemporaneous with the murder of Willoughby, and it set the context for that offense. It is evidence that added to the complete and coherent picture of the murder and was, therefore, properly admitted.

### E.

■ Next Harris claims that the medical examiner failed to state the cause of Willoughby's death in her testimony and that

the state failed to establish that the gunshot wound caused the death of the victim. Thus, Harris reasons, the trial court committed plain error in failing to direct a verdict of acquittal at the close of the state's evidence.

 We review a challenge to the sufficiency of the evidence to determine whether there is sufficient evidence from which a reasonable juror might find the defendant guilty beyond a reasonable doubt. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). We accept "as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence." *Id.*

In her testimony before the jury, the medical examiner indeed failed to state that the gunshot the victim sustained caused his death. She did describe, however, in somewhat graphic detail, the effects of the gunshot on the victim. Dr. Peterson testified that the path of the large caliber bullet took it through the carotid artery, one of the two blood vessels that supply the brain, and testified further to the damage the bullet did in the neck before exiting.

Standing alone, Dr. Peterson's testimony would be insufficient to support a conviction. However, eyewitness testimony established that George Harris shot the victim with a .41 caliber magnum handgun. The bullet from that weapon fractured Willoughby's mandible, avulsed the tissues of the mouth and tongue, lacerated the carotid artery, and produced bleeding and swelling which obstructed the victim's airway.

Several eyewitnesses recounted for the jury how the victim, bleeding profusely from the wound, stumbled down the steps of the house and tried to go next door. The evidence showed that the victim reached the steps of the house next door, collapsed, and continued to bleed. By the time someone summoned paramedics, Willoughby had exsanguinated and died. When all the evidence and inferences properly drawn from it are considered, sufficient evidence exists to support the conviction.

### F.

 Despite an unending line of recent cases from this Court holding that the "firmly convinced" language of MAI–CR3d 302.04 on reasonable doubt is constitutional, *State v. Shurn*, 866 S.W.2d 447, 462 (Mo. banc 1993); *State v. Ramsey*, 864 S.W.2d 320 (Mo. banc 1993); *State v. Waller*, 816 S.W.2d 212 (Mo. banc 1991); *State v. Antwine*, 743 S.W.2d 51, 63 (Mo. banc 1988); *State v. Guinan*, 732 S.W.2d 174 (Mo. banc. 1987), the claim that the instruction violates federally mandated due process standards continues to be presented to this Court. There is no precedential value in another explanation. "Firmly convinced" is essentially synonymous with "beyond a reasonable doubt." The point is denied, again.

### IV.

Harris' next two points relate to the penalty phase of the trial.

### A.

First, he alleges that the trial court erred in giving Instruction No. 17. With respect to this instruction, appellant makes the following arguments. (1) It violated Section 565.-032.2(1), RSMo 1986, for the trial court to submit an aggravating circumstance for each of appellant's convictions; (2) the trial court failed to make a determination that the three convictions were for serious assaultive offenses; (3) the trial court erred in allowing consideration of serious assaultive offenses that *occurred after the homicide*; (4) the trial court failed to give a limiting instruction for the term "depravity of mind;" and (5) the trial court erred in submitting the aggravating circumstance that appellant committed the murder for the purpose of receiving something of monetary value.

Instruction No. 17 reads as follows:

In determining the punishment to be assessed under Count 1 against the defendant for the murder of Stanley "Hank" Willoughby, you must first unanimously determine whether one or more of the following aggravating circumstances exist:

1. Whether the defendant was convicted of robbery in the first degree on September 15, 1976 in the Circuit Court of Jackson County, Missouri.

2. Whether the defendant was convicted of robbery in the first degree on October 2, 1989 in the Circuit Court of Boone County, Missouri.

3. Whether the defendant was convicted of armed criminal action on October 2, 1989 in the Circuit Court of Boone County, Missouri.

4. Whether the murder of Stanley "Hank" Willoughby involved depravity of mind and whether as a result thereof, the murder was outrageously vile, horrible and inhuman. You can make a finding of depravity of mind only if you find that the defendant killed Stanley "Hank" Willoughby as a part of defendant's plan to kill more than one person and thereby exhibited a callous disregard for the sanctity of all human life.

5. Whether the defendant murdered Stanley "Hank" Willoughby for the purpose of the defendant receiving money or any other thing of monetary value from Stanley "Hank" Willoughby or another.

You are further instructed that the burden rests upon the state to prove at least one of the foregoing circumstances beyond a reasonable doubt. On each circumstance that you find beyond a reasonable doubt, all twelve of you must agree as to the existence of that circumstance.

Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing circumstances exist, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Division of Corrections without eligibility for probation or parole.

### 1.

In his first allegation of error with respect to this instruction, appellant alleges that it violated Section 565.032.2(1) for the trial court to submit an aggravating circumstance for each of appellant's convictions.

Section 565.032.2 reads as follows:

Statutory aggravating circumstances for a murder in the first degree offense shall be limited to the following:

(1) The offense was committed by a person with a prior record of conviction for murder in the first degree, or the offense was committed by a person who has one or more serious assaultive criminal convictions.

Instruction No. 17 was patterned after MAI CR3d 313.40, which mandates that each of defendant's relevant prior convictions be enumerated as a separate aggravating circumstance.

Appellant argues that the separate listing of each of appellant's convictions was prejudicial to defendant because the repeated emphasis on his convictions had the effect of turning one statutory aggravating circumstance into three aggravating circumstances.

This argument was soundly rejected by this Court in *State v. Clemmons*, 753 S.W.2d 901, 911–12 (Mo. banc 1988). There, the Court stated:

[T]he structure of the death penalty statutes implicitly demands that each conviction relevant under Section 565.032.2(1) be submitted separately. Once a jury finds even a single aggravating circumstance it may consider imposing the death penalty. Section 565.030.4; *State v. Shaw*, 636 S.W.2d 667, 675 (Mo. banc 1982).... A jury finding that the defendant has any conviction relevant under Section 565.032.-2(1) is sufficient to meet this threshold requirement for jury consideration of the death penalty. Because a finding of any such conviction permits jury consideration of the death penalty, each one must be listed as a separate aggravating circumstance in the instructions in order to avoid confusing the jury.

The separate listing of each of defendant's convictions was, therefore, proper.

### 2.

Appellant next argues that it was error to list defendant's convictions as an aggravating circumstance under Section 565.032.2(1) because the trial court never made a determination that the convictions were for serious assaultive offenses as required by MAI-CR3d 313.40. Notes on Use 4.

This allegation is not supported by the record. The trial court determined that it needed to find beyond a reasonable doubt that the defendant had been convicted of at least three assaultive-type offenses and the court subsequently found that defendant's convictions were serious assaultive-type convictions.

### 3.

■ Appellant also alleges that his convictions for robbery and armed criminal action in Boone County, Columbia, should not have been submitted as aggravating circumstances because those crimes were committed on March 15, 1989, while Harris fled Kansas City following the murder. This claim was not raised in appellant's motion for a new trial and is therefore not preserved for appeal. *State v. Root*, 820 S.W.2d 682, 687–88 (Mo.App.1991). Review is for plain error. Rule 30.20.

■ The trial court properly submitted appellant's convictions. Section 565.032.2(1) allows the jury to consider only those convictions for first degree murder committed prior to the charged offense; no such limitation is imposed for serious assaultive offenses. Serious assaultive offenses committed both before and after the charged offense can be used as aggravating circumstances.

### 4.

■ Harris claims that the statutory aggravating factor relating to depravity of mind was unconstitutionally vague because· the court did not give the required limiting instruction to define depravity of mind.

In *State v. Ramsey*, 864 S.W.2d 320, 328 (Mo. banc 1993), this Court approved a nearly identical instruction on depravity of mind. There, the court found that depravity of mind has been judicially defined and limited to mean that "the defendant acted with a callous disregard for the sanctity of life, inflicted physical or psychological torture upon his victim, as when the victim has a substantial period of time before death to anticipate and reflect upon death, the brutality of defendant's conduct or nature of the crime involved serious physical abuse, mutilation of the body after death, the absence of any substantive motive, or the absence of remorse. *Sidebottom v. State*, 781 S.W.2d 791, 799 (Mo. banc 1989); *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988); and *State v. Preston*, 673 S.W.2d 1, 11 (Mo. banc 1984)."

The statutory aggravating factor in Instruction No. 17 is not constitutionally infirm. The trial court's instruction narrowly defined "depravity of mind" for the jury, consistent with judicial precedent.

### 5.

■ Finally, appellant argues that the fifth aggravating circumstance should not have been submitted to the jury because there was no evidence to suggest that Harris murdered Willoughby for the purpose of obtaining a thing of monetary value.

Appellant's argument seems to be that because Harris killed Willoughby when he refused to turn over Harris' guns, Harris did not kill for the purpose of obtaining a thing of monetary value. Harris' argument depends on the premise that the guns illegally obtained by Harris had no monetary value. We disagree.

In a milieu in which the law is irrelevant to one's course of conduct and in which possession by whatever means constitutes ownership for that moment, Harris' decisions to obtain the guns by armed threat and deadly violence is little different than an armed robbery. Harris had paid $500 for the guns. There can be little doubt that the guns had a monetary value for him and that he used deadly force for the purpose of obtaining them.

### B.

During closing argument the following colloquy took place:

Mr. Peters: What if Michael Taylor had decided, "I'm not going to play my role?"

Mr. O'Connor: I'm going to object to this as not proper argument.

The Court: I haven't heard enough of it to—overruled.

Mr. Peters: What would have happened if Michael Taylor had not played his role in the process that this man started? What

would have happened if—you saw her, Donna Jacobs, petrified, with the tear coming down her eye, unable to identify this defendant.

What would have happened if all the State's witnesses had done that?

Mr. O'Connor: I have an objection. May we approach the bench?

Mr. O'Connor: This argument is to inflame the jury an [sic] indicate to the jury that George Harris was a person to be feared and that all these people came forward, even though they were in that fear, and there's no evidence to support that in the record.

Because the witness was crying doesn't mean she was scared because she was in court. He's trying to indicate she was in fear of this defendant, and this argument is nothing more than to raise the passion of the jury at this time.

Mr. Peters: It's argument, Your Honor.

The Court: I'm trying to remember—

Mr. Peters: Judge, it was evidence in the case.

The Court: I think I remember which girl she was. I'm going to overrule the objection.

■■■ Harris maintains that the prosecutor's statements were intended to inflame the passions of the jury and that "[c]learly, the prosecutor was attempting to inform the jury that the state's witnesses were all afraid of Harris."

■■■ During closing argument a prosecutor is allowed to argue the evidence and all reasonable inferences from the evidence. *State v. Armbruster*, 641 S.W.2d 763 (Mo. banc 1982). The prosecutor has a right to draw any inferences from the evidence which he believes in good faith are justified. *Id.*

The transcript of Ms. Jacobs' testimony is peppered with constant reminders to Ms. Jacobs to speak up or to answer "yes" or "no." Her testimony was hesitant and nervous. It is reasonable to infer that Donna Jacobs was scared of a man who carried a .41 magnum handgun and who used it without hesitation when someone appeared to thwart his needs. It is reasonable to infer that she

feared a man she described as calm as he walked about in a blood-spattered silk shirt following the shooting.

Viewed in the context of the entire record before this Court, we find no error in the prosecutor's argument. It was made in good faith and the evidence supported the reasonable inferences made by the prosecutor.

Each of Harris' arguments concerning penalty phase Instruction No. 17 is denied.

## V.

Harris presents four points of error relating to the denial of his Rule 29.15 motion raising claims of ineffective assistance of counsel.

## A.

■■■ Trial counsel is ineffective if (1) he or she fails to exercise the customary skill and diligence that a reasonably competent attorney would exercise under similar circumstances, and (2) the failure to exercise such diligence is prejudicial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Prejudice exists only where trial counsel's acts or failures to act are outcome determinative. The movant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Ervin,* 835 S.W.2d 905, 929 (Mo. banc 1992), *citing Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Moreover, the movant must overcome the presumption that counsel is competent. *State v. Debler,* 856 S.W.2d 641, 652 (Mo. banc. 1993), *citing Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Reasonable trial strategy is not a ground for ineffective assistance of counsel. *Ervin,* 835 S.W.2d at 931 (Mo. banc 1992).

■■■ Bowing to the motion court's superior ability to assess the credibility of witnesses, we reverse the motion court only if the motion court's "findings of fact and conclusions of law are clearly erroneous." Rule 29.15(j). "The trial court's findings and conclusions are clearly erroneous only if, after a review of the entire record, the appellate court is left with the definite and firm im-

pression that a mistake has been made." *Ervin*, 835 S.W.2d at 928.

### B.

Harris initially raises two claims of ineffective assistance of trial counsel relating to trial counsel's alleged failure to investigate Harris' mental health and present evidence that Harris suffered from post-traumatic stress syndrome. The discussion that follows must be set against the background of trial counsel's decision to try the case on a self-defense theory. The record reveals that Harris agreed wholeheartedly with this strategic decision.

At trial Harris testified that he returned to Michael Taylor's house to retrieve the machine guns he had left there earlier in the day. When he asked for the machine guns, no one seemed to know where they were. An argument followed. During the argument, Harris claimed that he saw Willoughby "grab something" and that he "seen [sic] a barrel of a gun, the handle of a gun." Harris testified that he shot Willoughby in self-defense.

Harris' Rule 29.15 motion now claims that trial counsel failed to pursue another available defense. These new assertions are not persuasive. They amount to a sober recognition that the initial defense strategy Harris approved was not successful and that, with hindsight, Harris can now see that trial counsel should have made a different strategic choice.

### 1.

█ Harris alleges that the motion court erred when it denied his claim that trial counsel was ineffective in failing to conduct an investigation into his mental health for presentation during the penalty phase of the trial. Harris argues that trial counsel had previously defended him, knew that he had suffered serious gunshot wounds prior to March 11, 1989, had been told prior to trial that Harris experienced recurrent nightmares and paranoia after he was shot, should have suspected that Harris suffered from some sort of disturbed mental state, and should reasonably have undertaken an investigation into his mental health that would

have revealed that Harris suffered from post-traumatic stress syndrome. Harris concludes that presentation of post-traumatic stress evidence to the jury at the penalty phase would have served as powerful evidence in mitigation.

Missouri is a fact pleading state. Rule 29.15 is consistent with that regime. "The procedure before the [motion] court is governed by the Rules of Civil Procedure insofar as applicable." Rule 29.15(a). Rule 29.15(e) advises motion counsel to amend a *pro se* motion "[i]f the motion does not assert sufficient facts."

Prior to the Rule 29.15 hearing in this case, the motion court determined that those portions of Harris' amended motion charging trial counsel with failure to "establish through the testimony of a qualified mental health professional that ... Movant acted under the influence of a mental disease or defect" (Amended Motion for Post Conviction Relief) failed to allege facts which, if true, would entitle Harris to relief. Our review of the amended motion leads us to the same conclusion. Nowhere does the amended motion set out the nature of Harris' supposed mental disease or defect beyond the general statement already quoted. That Harris has refined that point substantially in preparation for trial and on appeal and now describes a specific psychological impairment does not remedy the pleading defect.

For reasons that the record does not make clear, however, the trial court permitted Dr. William O'Connor to opine at the Rule 29.15 hearing that Harris suffered from post-traumatic stress syndrome as a result of the gunshot wounds he suffered prior to the murder. We review the point *ex gratia*.

█ It is true that trial counsel has a "duty to make a reasonable investigation of possible mitigating evidence or to make a reasonable decision that such an investigation is unnecessary." *Clemmons v. State*, 785 S.W.2d 524, 528 (Mo. banc 1990). Before a duty arises in trial counsel to pursue an investigation of a mental disease or defect, however, there must be some meaningful factual indication that such a disease or defect exists.

Trial counsel testified at the Rule 29.15 hearing that he had indeed represented appellant on various charges in the past and had conferred with him on trial strategy in this case. Consistent with trial counsel's extensive experience with Harris, trial counsel saw no evidence of mental impairment in Harris' conduct. Moreover, Harris voiced definite notions about the trial strategy he wished counsel to pursue. With Harris' own counsel and consent, trial counsel vigorously pursued a trial strategy centering around self-defense and Harris' firm, but mostly unsubstantiated, recollection of the events surrounding the murder.

Facing death, Harris now reasons backward and concludes that he suffered from post-traumatic stress syndrome at the time he shot and killed Hank Willoughby. He claims that his trial counsel should have realized that he had post-traumatic stress syndrome when trial counsel learned from Harris' girlfriend that he suffered nightmares and acted paranoid after he had been shot himself. That he could not articulate the nature of his problem in either the *pro se* or amended Rule 29.15 motions escapes Harris. Instead, with the clear assurance and desperate motivation of one who faces the death sentence, Harris insists that his trial counsel should have guessed what he, Harris, did not reveal through his actions and which he could not describe in his legal papers. We will not convict trial counsel of ineffectiveness in failing to pursue that which no one could be expected to discover in the exercise of ordinary skill.

Moreover, it is often the case that the defense strategy chosen during the guilt phase determines the evidence that trial counsel can credibly present to the jury during the penalty phase. To be effective, Harris' post-traumatic stress argument depends on a factual conclusion that Willoughby did not do anything that justified Harris' deadly response and that the post-traumatic stress caused his misjudgment. The injection of evidence of a mental disease or defect during the penalty phase risks alienating a jury that has consistently heard a different theory of the case during the guilt phase. It is a reasonable strategic decision by trial counsel

to avoid presenting a defense *du jour* to the jury. The point is denied.

### 2.

▪ Appellant next assigns error to the motion court's denial of his claim that trial counsel rendered ineffective assistance of counsel by failing to pursue possible mental defenses that would have proved defendant lacked the capacity to deliberate and could not have formed the requisite specific intent for first degree murder. Again, Harris relies on the opinion of Dr. O'Connor that he suffered post-traumatic stress syndrome as a result of previous gunshot wounds. The motion court denied this claim after an evidentiary hearing, concluding that Harris' amended motion failed to state facts which, if true, entitled him to relief.

▪ Reviewing the point *ex gratia*, we conclude that the record clearly shows that trial counsel chose to assert self-defense as the defense's theory of the case. There are two rationales for choosing such a course. First, as we have previously said, trial counsel saw no indication that Harris suffered from a mental disease or defect. Second, a defense of post-traumatic stress syndrome is inconsistent with self-defense and, if offered during trial, presents the substantial risk of diluting the efficacy of a self-defense theory we have previously discussed. Thus, the strategic decision to pursue self-defense vigorously necessarily required trial counsel to eschew any other effective defense that threatened to weaken the chosen course. Reasonable strategic decisions are not transformed into ineffective counsel claims because a jury rejects the theory of the case. *Ervin*, 835 S.W.2d at 931.

### C.

▪ Harris' final two Rule 29.15 points relate to trial counsel's failure to call witnesses during the guilt and penalty phases of the trial. Ordinarily the choice of witnesses is a matter of trial strategy and will support no claim of ineffective assistance of counsel. *Sanders v. State*, 738 S.W.2d 856, 858 (Mo. banc 1987). This is because "strategic choices made after thorough investigation of law and facts relevant to plausible

options are virtually unchallengeable." *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *Leisure v. State,* 828 S.W.2d 872, 875 (Mo. banc 1992). Trial counsel may be ineffective in failing to locate and call witnesses if the movant can show that trial counsel knew or should have known of the existence of such witnesses, that the witnesses could have been located through reasonable investigation, that the witnesses would have testified if called and that their testimony would have provided a viable defense. *State v. Vinson,* 800 S.W.2d 444, 448–449 (Mo. banc 1990).

### 1.

 Harris asserts that trial counsel should have offered the testimony of Beverly McAffee, one of Harris' girlfriends, during both the guilt and penalty phases of the trial. Harris' asserts that McAffee would have testified that Harris arrived at her home between 8:00 and 9:00 p.m., covered with blood and acting hysterically.

During the guilt phase, Sabrina Lowe, another of Harris' girlfriends, testified that Harris came to her apartment after the shooting wearing different clothing than she had seen him wearing earlier in the day. Lowe also testified that Harris brought the machine guns with him and that she accompanied him to the Champagne Lounge, where Harris intended to kill a man named "Rudi."

At the Rule 29.15 hearing, trial counsel testified that McAffee had a criminal record in her own right, that her testimony tended to support Lowe's testimony, lending credibility to Lowe's damning testimony about Harris' intentions after he killed Willoughby. In addition, McAffee's testimony concerning Harris' changing clothes and destroying his blood-stained shirt was not consistent with self-defense. Added to Lowe's testimony, McAffee's testimony would serve little purpose beyond highlighting Harris' guilty mind and attempts to flee after the crime. In trial counsel's judgment, this testimony undermined the self-defense strategy which Harris and trial counsel agreed to pursue at trial.

Thus, there is ample support for trial counsel's strategic decision to let Barbara McAffee remain mute during both the guilt and penalty phases of the trial. Such a decision avoided weakening Harris' self-defense presentation and attempted to maintain counsel's credibility with the jury in the penalty phase. That the crystal clear vision of hindsight permits Harris to posit a defense he believes might have worked better is without consequence where trial counsel's strategic decision appears reasonable.

### 2.

Harris next contends that Karen Kelton could have corroborated McAffee's story that defendant arrived in a hysterical state at McAffee's apartment. Trial counsel chose not to ask Barbara McAffee to testify. The trial court held, and we agree, that that decision was reasonable trial strategy. A decision not to offer the testimony of a witness corroborating McAffee is consistent with that strategy.

### 3.

 Appellant alleges trial counsel failed to call Sherry Porter, another of Harris' girlfriends, to testify at trial. Porter would have testified that on the night of the homicide, Harris came to her apartment, never mentioned having shot Willoughby, and that the two of them went to a Ramada Inn near Grandview, Missouri, and stayed there two days. Porter testified at the Rule 29.15 hearing.

Harris claims that Porter's testimony would have contradicted the testimony of Sabrina Lowe. Specifically, Harris believes that Porter refutes Lowe's claims that Harris saw her the night of the murder and went to the Champagne Lounge intending to kill Rudi.

There is nothing in Porter's statement that is inconsistent with Lowe's testimony. First, Porter carefully neglects to mention the time in the "evening" when Harris arrived at her apartment. Second, she confirms Lowe's testimony that Harris carried a beeper, and by implication Lowe's testimony that she, Lowe, tried to reach Harris the next day, but that "some young lady named Sherry" called her back. Third, Porter's testimony is incon-

sistent with Harris' self-defense theory and shows an attempt on Harris' part to hide after the murder. Fourth, Harris' failure even to mention Willoughby's shooting to Porter is also inconsistent with self-defense. Remarkably, it is also inconsistent with McAffee's testimony and Harris' Rule 29.15 theory that he was emotionally distraught over the events of the day. The motion court found that trial counsel's unwillingness to offer the jury Porter's testimony was sound strategy. We concur.

### 4.

Appellant claims that although Ben Brown's name was listed on the police report, trial counsel failed to contact Brown or call him as a witness at trial. At the Rule 29.15 hearing, Ben Brown testified that he was an eyewitness to the shooting and that he saw a "black revolver" lying "in the middle of the floor." Brown speculated that the gun had come from Hank Willoughby, but on cross-examination admitted that he never saw the gun "on Hank Willoughby" and that he did not know where the gun had come from.

The police report at issue refers to a "Ben, B/M, 15 years of age." The police report offers no surname. Appellant's trial counsel read the police reports, but testified at the Rule 29.15 hearing that he could not recall ever learning of a Ben Brown. Moreover, none of the other witnesses at trial, including Harris himself, ever named either a Ben or a Ben Brown as a witness to the shooting. Harris thus fails to meet his burden of showing that trial counsel could reasonably have known of Brown and or his testimony.

The motion court made the following finding:

> Ben Brown is the only potential witness who was not called, and about whom movant complains, that might have assisted the defense. His testimony that the victim might have been reaching for a gun and that a gun was seen near the site of the shooting, might have been helpful to movant. However, there is no evidence in the trial transcript and there was no evidence at the hearing that counsel was aware of Mr. Brown's identity and that he was a

possible witness. Counsel cannot be faulted for failing to investigate and call Brown.

The motion court's conclusion is not clearly erroneous.

### 5.

Relegated to a footnote, Harris also urges that Michael Lumpkin would have testified at trial that Sabrina Lowe, one of the state's key witnesses, told him that she would make up a story about Harris because it would help her in her own criminal case.

Michael Lumpkin allegedly passed this information to Harris while they were incarcerated together. Defense counsel testified that had this been true, he would have expected Harris to pass this information to him and, based on this information, he would have questioned Lowe in her deposition and on the witness stand.

The trial court was entitled to believe, and apparently did believe, the testimony of trial counsel over Lumpkin's story. That decision is not clearly erroneous.

### 6.

Finally, Harris asserts that trial counsel was ineffective in failing to investigate and demand discovery of state's witness, Jarlath "Rudi" Potts, and in failing to cross-examine him during the penalty phase of the trial.

The state called Potts during the penalty phase. Potts had previously made several sworn statements to law enforcement personnel that he and Harris had committed several robberies together. Over trial counsel's strenuous and continuing objection, Potts proceeded to deny every statement he had previously made implicating Harris, claiming that he could not remember any of the events to which the statements referred. Potts did admit that he had pled guilty to three of the robberies about which the prosecutor questioned him. Trial counsel chose not to cross-examine Potts.

We cannot find a hint of merit in Harris' point. As the motion court observed, "it is clear from the record that no purpose would be served by cross-examination of Mr. Potts. The nature of his testimony was such that

further questioning would more likely yield negative rather than positive results."

Appellant's ineffective assistance of counsel claims are denied. The motion court did not clearly err in its findings of fact or conclusions of law.

## VI.

In his final point, appellant argues that Harris' death sentence is excessive and disproportionate and violates his Eighth Amendment right to be free from cruel and unusual punishment. Appellant argues that his punishment is excessive and disproportionate because at the time of the shooting, Harris was suffering from post-traumatic stress disorder and that his ability to deliberate was impaired.

Under the mandatory independent review contained in Section 565.035.3, RSMo 1986, this Court must determine:

1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

There is no suggestion in the record that appellant's sentence was the product of passion, prejudice, or some other arbitrary factor. The statutory aggravating circumstances submitted to the jury were valid and supported by sufficient evidence.

The sentence of death is not excessive or disproportionate compared to the penalty imposed in similar cases. This case is like other death penalty cases which involve defendants who have committed numerous other offenses. Cf. State v. Bannister, 680 S.W.2d 141, 149 (Mo. banc 1984), and State v. Jones, 749 S.W.2d 356, 364 (Mo. banc 1988). It is also like other cases in which the death penalty was imposed because the defendant committed the murder for the purpose of

obtaining something of monetary value from the victim. Cf. State v. Pollard, 735 S.W.2d 345, 347 (Mo. banc 1987); State v. White, 813 S.W.2d 862, 866–867 (Mo. banc 1991); and State v. Oxford, 791 S.W.2d 396, 401 (Mo. banc 1990).

Further, this case resembles other cases in which the court has failed to find as a mitigating factor the presence of a mental disease or defect. Cf. Antwine v. State, 791 S.W.2d 403, 411–412 (Mo. banc 1990); Sidebottom v. State, 781 S.W.2d 791, 797–798 (Mo. banc 1989); and State v. Mease, 842 S.W.2d 98, 114 (Mo. banc 1992). Appellant argues that the trial court should have set aside the death penalty after evidence was presented at the Rule 29.15 hearing that appellant suffered from post-traumatic stress syndrome. Dr. O'Connor testified at the Rule 29.15 hearing that he believed this syndrome would have impaired appellant's ability to deliberate at the time he shot the victim. The motion court found defense counsel's testimony more credible based on trial counsel's long acquaintance with appellant and his difficulty in believing that Harris suffered from any mental disabilities. The Rule 29.15 court was entitled to find that mental disease was absent as a mitigating factor.

Considering both the crime, the strength of the evidence and the defendant, the death penalty imposed in this case is not excessive or disproportionate.

## VII.

The judgments of the trial court are affirmed in all respects.

All concur.