**STATE of Missouri, Respondent,**

v.

**Henry PETTIT, Appellant.**

**No. WD 54503.**

Missouri Court of Appeals,
Western District.

Sept. 15, 1998.

586 ■ 

 

Rosalynn Koch, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jill C. LaHue, Asst. Atty. Gen., Jefferson City, for respondent.

Before HOWARD, P.J., and BRECKENRIDGE and SPINDEN, JJ.

BRECKENRIDGE, Judge.

Henry Pettit appeals from his convictions for first degree assault under § 565.050, RSMo 1994, and armed criminal action under § 571.015, RSMo 1994.[1] Mr. Pettit was sentenced to consecutive terms of ten years imprisonment for first degree assault and five years imprisonment for armed criminal action. Mr. Pettit raises four points on appeal, arguing that the trial court erred by: (1) admitting a physician's speculative testimony regarding one of the victim's increased risk of future medical problems due to a gunshot wound; (2) admitting evidence relating to Mr. Pettit's flight from the crime scene because the evidence constituted uncharged misconduct; (3) denying Mr. Pettit's motion for acquittal because the State did not prove that Mr. Pettit acted intentionally or knowingly or that the victims suffered serious physical injury; and by (4) overruling Mr. Pettit's objections to the State's closing argument because the remarks were intended to inflame and prejudice the jury.

The judgment of the trial court is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

On appeal from a criminal conviction, this court reviews the facts in a light most favorable to the jury's verdict. *State v. Storey*, 901 S.W.2d 886, 891 (Mo. banc 1995). On September 20, 1996, Lanair Perry and Benjamin Watson went to meet Mr. Watson's friend, Christine Johnson, at America's Pub, a bar in the Westport area of Kansas City, Missouri. Ten to twenty minutes after Mr. Perry and Mr. Watson arrived at the bar, Sheralee Hund engaged Mr. Perry in conversation. Mr. Pettit considered Ms. Hund to be his girlfriend, so he took offense to Mr. Perry speaking with Ms. Hund. Mr. Pettit

---

1. All statutory references are to Revised Statutes of Missouri 1994, unless otherwise indicated.

approached Mr. Perry and told Mr. Perry "Don't even think about it." Mr. Perry told Mr. Pettit "to go f—— hisself." Mr. Pettit responded "I know a lot of people and you can get f——— up in here." Mr. Perry answered "I don't care who you know in here, get out of my face with that."

The two exchanged profanities until Mr. Pettit hit Mr. Perry in the face with his fist. Mr. Perry then grabbed Mr. Pettit and the two wrestled until Mr. Perry slammed Mr. Pettit to the ground and struck Mr. Pettit seven to ten times in the face before he was pulled away by an America's Pub bouncer. Mr. Pettit got up and moved to strike Mr. Perry while Mr. Perry was being restrained by the bouncer. Mr. Watson then struck Mr. Pettit in the face in response to his actions. Mr. Pettit was forcefully escorted out the back door and Mr. Perry and Mr. Watson were forcefully escorted out the side door. Upon being ejected, Mr. Pettit walked directly from behind the bar around to his vehicle in a parking lot. The parking lot was across the street from the establishment's side door. Mr. Pettit retrieved a loaded .380 semi-automatic pistol from his vehicle, tucked the pistol behind his back and began walking across the street to the side door, where Mr. Perry and Mr. Watson were standing and talking to Ms. Johnson.

Mr. Pettit walked to within eight feet of Mr. Perry and Mr. Watson, reached behind his back and drew his pistol. Mr. Perry and Mr. Watson saw Mr. Pettit with the gun and ran in the opposite direction. Mr. Pettit aimed at them and fired four shots as they ran down the street. Neither Mr. Perry nor Mr. Watson was hit by a bullet. However, Travis Gray and Brendan Cook, two Canadian businessmen who were waiting for friends to leave the bar, were each struck by an errant bullet. Mr. Gray was shot in the hip and Mr. Cook was wounded in the knee.

Mr. Pettit stopped firing at the pleading of Ms. Johnson, and ran back to the parking lot where his car was parked. Maranda Fedric was riding in a car going down the street when she heard gunfire and saw a man run across the parking lot to a car. Ms. Fedric's friend, who was driving Ms. Fedric's car, attempted to block the exit of the parking lot with their vehicle. Mr. Sanders, the director of Westport security, heard shots fired and saw Mr. Pettit running across the parking lot. Mr. Sanders gave chase until Mr. Pettit got into his vehicle and started to leave the lot. Mr. Sanders proceeded to block the parking lot's only exit and "drew [his] sidearm and held [his] sidearm and [his] badge like this and was ordering the suspect to stop, [He] heard the engine rev and the vehicle appeared to accelerate towards [him]." Mr. Sanders then "dove behind the parking booth and the vehicle exited." Ms. Fedric and her friend put their heads down to brace themselves for a collision when Mr. Pettit's car swerved around her vehicle onto the street. The two women then followed the car and got the license plate numbers, which were given to the police at the scene. Mr. Pettit was later apprehended at an area convenience store, with a semi-automatic pistol in his possession. Mr. Pettit was subsequently charged with first degree assault and armed criminal action.

At trial, Mr. Gray, Mr. Cook and Mr. Cook's treating physician, Dr. Devin Data, testified to the extent of the physical injury to Mr. Gray and Mr. Cook. Mr. Gray testified that he was shot in the hip and was taken to the hospital. Mr. Gray also testified that his treating physician determined it would do more harm than good to remove the bullet which was lodged in his pelvis. Mr. Gray said it was very painful to walk for approximately three weeks after the shooting. He limped very heavily when walking, and stayed off the injured leg as per doctor's orders. It was also painful for Mr. Grey to sit. He developed an infection two weeks after the shooting which required further medical treatment.

Mr. Cook was also wounded in the shooting. Mr. Cook testified that he was shot in the knee and was taken to the hospital. When questioned about the extent of his injuries, Mr. Cook testified that the bullet entered his knee joint and lodged in his femur; that the injury required surgery under general anesthesia to remove and repair bone and cartilage fragments, but the bullet was left in his leg. Mr. Cook was hospitalized for two days. He experienced continu-

ous pain and could not walk unaided for approximately one month. Mr. Cook further testified that he still experienced intermittent soreness at the time of the trial.

In addition, Dr. Data testified concerning Mr. Cook's potential medical problems. The prosecutor asked Dr. Data what future problems Mr. Cook would be more likely to suffer due to the gunshot wound. Mr. Pettit objected that such testimony called for speculation. The trial court overruled Mr. Pettit's objection and Dr. Data responded "Right, it is speculation. There is no way for sure to say what kind of damage he is going to have." The prosecutor asked Dr. Data whether Mr. Cook was more likely to develop future medical problems due to the gunshot wound. The trial court overruled Mr. Pettit's objection and directed Dr. Data to answer, if he was able to do so without speculation and if there was a "reasonable medical certainty basis" for his answer. Dr. Data responded that Mr. Cook was at a heavily increased risk of developing future problems due to the gunshot wound.

The jury convicted Mr. Pettit of first degree assault and armed criminal action and recommended sentences of consecutive terms of ten years imprisonment and five years imprisonment, respectively. The trial court entered judgment against Mr. Pettit, imposing the recommended sentences. This timely appeal follows.

### POINTS ON APPEAL

### POINT ONE—DR. DATA'S TESTIMONY WAS ADMISSIBLE

In his first point on appeal, Mr. Pettit contends that the trial court erred by admitting Dr. Data's testimony regarding Mr. Cook's increased risk of future medical problems as a result of the gunshot wound. Mr. Pettit argues that Dr. Data's testimony was speculative because Dr. Data testified that it was uncertain whether Mr. Cook was going to develop future medical problems due to the gunshot wound.

The trial court has broad discretion in deciding whether to admit or exclude evidence. *State v. Wahby*, 775 S.W.2d 147, 153 (Mo. banc 1989). "Because expert testimony is always fraught with questions of relevancy and competency, the decision to admit expert conclusions is a matter of trial court discretion that will not be overturned on appeal absent an abuse of discretion." *State v. Skillicorn*, 944 S.W.2d 877, 891 (Mo. banc 1997) (quoting *State v. Copeland*, 928 S.W.2d 828, 837 (Mo. banc 1996)). The trial court abuses its discretion if its ruling is clearly against the logic of the circumstances or unreasonable or arbitrary. *State v. Jack*, 813 S.W.2d 57, 60 (Mo.App.1991).

Under § 565.050, "[a] person commits the crime of assault in the first degree if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person." "Serious physical injury" is defined as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." Section 565.002. Mr. Pettit contends that the trial court erred by admitting Dr. Data's testimony regarding Mr. Cook's increased risk of future injury because the testimony was speculative and allowed the jury to find the presence of serious physical injury as to Mr. Cook. Without such a finding, Mr. Pettit argues that the jury would have convicted him of a lesser crime.

The portion of Dr. Data's testimony of which Mr. Pettit complains on appeal was based on established substantial facts and therefore, was properly admitted. The scope and magnitude of injury to Mr. Cook was at issue, therefore, specific questions regarding the injury clearly are logical under the circumstances. *See State v. Carlson*, 792 S.W.2d 434, 436 (Mo.App.1990). Although Dr. Data, upon initial questioning, did respond that an answer regarding Mr. Cook's future medical problems was speculative, the trial court directed Dr. Data to respond if he was able to without speculation and if there was a reasonable medical certainty basis for his answer. Dr. Data gave his opinion that Mr. Cook was at an increased risk of developing future medical problems due to the gunshot wound.

A medical expert's opinion given in a criminal proceeding must have a substantial basis of fact in the record from which to form the opinion. *State v. Wheadon,* 779 S.W.2d 708, 710 (Mo.App.1989). Dr. Data was one of Mr. Cook's treating physicians and participated in the surgery to repair Mr. Cook's wounded knee. A physician may base his opinion on facts observed in the course of the physical examination. *State v. Brooks,* 551 S.W.2d 634, 657 (Mo.App.1977). The evidence of Dr. Data's education, clinical experience, examination and participation in the surgery certainly supplies the requisite factual basis for his opinion regarding Mr. Cook's risk of future medical problems. Mr. Cook suffered a gunshot wound in the knee in which pieces of bone and cartilage were removed and the bullet was left in the articulating portion of the femur. There are sufficient facts to establish that Mr. Cook is at an increased risk of future medical problems as a result of the gunshot wound. The opinion testimony was not speculative and was therefore properly admitted. Point I denied.

## POINT TWO—EVIDENCE OF UNCHARGED MISCONDUCT WAS ADMISSIBLE

In his second point on appeal, Mr. Pettit contends the trial court erred by admitting evidence relating to Mr. Pettit's flight from the crime scene because the evidence constituted uncharged misconduct.

The standard of review on the trial court's admission of evidence is an abuse of discretion, *Wahby,* 775 S.W.2d at 153. The general rule is that evidence of uncharged misconduct is inadmissible to show the defendant's propensity to commit such crimes. *State v. Harris,* 870 S.W.2d 798, 810 (Mo. banc), *cert. denied,* 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). If the jury were to hear evidence of uncharged misconduct, the jury may tend to convict the defendant based on the propensity to commit such crimes, rather than upon evidence of whether the defendant actually committed the crime charged. *See State v. Conley,* 873 S.W.2d 233, 236 (Mo. banc 1994). There are exceptions to the rule, however. Evidence of other offenses is admissible if it "tends to establish motive, intent, identity, the absence of mistake or accident, or a common scheme or plan." *Harris,* 870 S.W.2d at 810. Such evidence is also admissible "to present a complete and coherent picture of the events that transpired." *Id.* Evidence of uncharged misconduct must be "logically relevant (*i.e.,* it must tend to establish guilt for the crime) and legally relevant (*i.e.,* its probative value must outweigh its prejudicial effect)." *State v. Ross,* 923 S.W.2d 354, 356 (Mo.App.1996). "The balancing of the effect and value of evidence rests within the sound discretion of the trial court." *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993).

Mr. Pettit maintains the shooting was committed recklessly rather than intentionally. He argues that because he admitted guilt of some offense, his uncharged misconduct is irrelevant to establish his guilt for the charged crimes. The State is not bound to Mr. Pettit's version of the events. *State v. Malady,* 669 S.W.2d 52, 54 (Mo.App.1984). Therefore, the State is free to ignore Mr. Pettit's contention of a reckless shooting and establish that Mr. Pettit committed the crime intentionally. In doing so, the State can introduce evidence of uncharged misconduct, so long as the evidence falls within the exceptions to the general rule.

Evidence of Mr. Pettit's flight presents "a complete and coherent picture of the events that transpired." *Harris,* 870 S.W.2d at 810. Mr. Pettit started a fight and lost. After he was forcefully escorted out of the bar, he immediately walked to his vehicle, retrieved his pistol, and walked to where Mr. Perry and Mr. Watson were standing. Mr. Pettit drew his gun and fired four shots at Mr. Perry and Mr. Watson as they ran away. Mr. Pettit then fled the scene, undeterred by Mr. Sanders standing in the parking lot exit with a badge and a gun, ordering him to stop. Mr. Pettit was later apprehended at a local convenience store. In *Skillicorn,* 944 S.W.2d at 887, the defendant's misconduct, several hours after the events of the crimes charged, was found admissible by the Supreme Court as a "continuation of the sequence of events that presents a coherent picture of [defendant's] crime." Excluding evidence of Mr. Pettit's flight from the scene would render

the events incomplete. Accordingly, Mr. Pettit's actions after the shooting are relevant "to present a complete and coherent picture of the events that transpired." *Harris*, 870 S.W.2d at 810.

Mr. Pettit's flight from the scene also indicates consciousness of guilt for the crimes charged and the absence of mistake or accident. In *State v. Perryman*, 851 S.W.2d 776, 779 (Mo.App.1993), the defendant's uncharged misconduct during his flight from arrest was relevant to show the defendant's consciousness of guilt because his actions were an attempt to avoid arrest. "A permissible inference of guilt may be drawn from acts or conduct of an accused subsequent to an offense if they tend to show a consciousness of guilt by reason of a desire to conceal the offense or role therein." *State v. Schwartz*, 899 S.W.2d 140, 144 (Mo.App. 1995). A reasonable inference can be drawn that Mr. Pettit's flight from the scene, and attendant uncharged misconduct, was to escape capture for the offense of which he was conscious of committing and thus to "conceal his role therein." With respect to an absence of accident, in *State v. Tracy*, 918 S.W.2d 847, 851 (Mo.App.1996), the defendant's flight from the scene was used to "solidify" the conclusion that the shooting was not accidental. Mr. Pettit's flight from the scene tends to establish his guilt for the crimes charged by showing his consciousness of guilt and strengthening the conclusion that the shooting was not accidental. Mr. Pettit's flight is necessary to accurately present the events of the crime and tends to establish his guilt for the crimes charged. The trial court did not abuse its discretion in admitting evidence of Mr. Pettit's flight. Point II denied.

## POINT THREE—THE EVIDENCE WAS SUFFICIENT TO SUPPORT CONVICTIONS

In his third point on appeal, Mr. Pettit contends the trial court erred by denying his motion for acquittal because the State did not prove every element necessary to sustain a conviction of first degree assault. Therefore, Mr. Pettit argues the State did not prove that he acted intentionally or knowingly and did not prove that he caused serious physical injury to either Mr. Gray or Mr. Cook.

In determining whether sufficient evidence supports the verdict, this court determines whether sufficient evidence exists from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc.), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). This court accepts as true all the evidence favorable to the State, including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary. *Id.* Substantial evidence consists of evidence "from which the trier of fact could reasonably find the issue in harmony with the verdict." *State v. Gordon*, 915 S.W.2d 393, 396 (Mo. App.1996) (quoting *State v. Gomez*, 863 S.W.2d 652, 655 (Mo.App.1993)).

Instruction No. 5, the verdict director for Count I, assault in the first degree, read, in pertinent part, as follows:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about September 20, 1996, in the County of Jackson, State of Missouri, the defendant attempted to kill or cause serious physical injury to Lanair Perry and/or Benjamin Watson by shooting at them, and

Second, that defendant in the course of such conduct caused serious physical injury to Travis Gray and/or Brendan Cook....

Mr. Pettit argues the State did not prove that he "attempted to kill or knowingly caused or attempted to cause serious physical injury to another person." Section 565.050. Direct evidence of the defendant's intent is rarely available; intent is most often proven by circumstantial evidence. *State v. Garner*, 800 S.W.2d 785, 788 (Mo.App.1990). As such, sufficient evidence exists from which the jury might have found Mr. Pettit guilty beyond a reasonable doubt. Mr. Pettit incited an altercation in which he was physically beaten in the presence of his "girlfriend." After a bouncer subdued Mr. Perry, Mr. Pettit tried to strike Mr. Perry, only prevented by Mr. Watson's blow to his face.

Bouncers forcefully escorted the parties out different exits of the bar. Mr. Pettit then walked all the way around the bar to his vehicle in a parking lot across the street from the door where Mr. Perry and Mr. Watson were standing. Mr. Pettit grabbed his semi-automatic pistol from his car, tucked it behind his back and walked across the street towards Mr. Perry and Mr. Watson. Without provocation, Mr. Pettit walked to within eight feet of Mr. Perry and Mr. Watson, pulled his pistol and began to point it at the two men. While Mr. Perry and Mr. Watson were fleeing, Mr. Pettit fired four shots at their backs. Mr. Pettit only stopped firing at the pleading of his frie... . Mr. Pettit then fled the scene and forced a security guard attempting to prevent his escape to dive out of the way.

Mr. Pettit testified that the shooting was reckless, not intentional, in that he fired the gun into the air to scare Mr. Perry and Mr. Watson. Mr. Pettit further testified that he was unable to hold the gun in the air; that "my arm started dropping from the pain in my right shoulder." The jury is not bound to accept Mr. Pettit's self-serving version of the events. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo.1989).

Mr. Pettit next argues the State did not prove that Mr. Cook or Mr. Gray suffered serious physical injury. Serious physical injury is defined as "physical injury that creates a substantial risk of death or that causes serious disfigurement or *protracted loss or impairment of the function of any part of the body.*" Section 565.002 (emphasis added). " 'Protracted' means something short of permanent but more than of short duration; what is considered protracted depends on the circumstances." *State v. Briggs,* 740 S.W.2d 399, 401 (Mo.App.1987). There is sufficient evidence to support a finding of serious physical injury to Mr. Cook and to Mr. Gray. In *State v. Ross,* 939 S.W.2d 15, 18 (Mo.App. 1997), the court held a victim's inability, after a gunshot wound, to walk unaided for a period of one week was sufficient to satisfy the protracted impairment requirement of serious physical injury. Mr. Cook suffered a gunshot wound which required surgery under general anesthesia to remove and repair bone and cartilage fragments. The bullet had to be left in his body. Mr. Cook experienced continuous pain and could not walk unaided for approximately one month. Mr. Cook's injuries are sufficient to support a finding of serious physical injury.

There is also sufficient evidence to allow a reasonable juror to find the presence of serious physical injury as to Mr. Gray. In *State v. Mentola,* 691 S.W.2d 420, 422 (Mo.App. 1985), a broken jaw for a period of six weeks was sufficiently protracted to constitute serious physical injury. The court, in *Briggs,* 740 S.W.2d at 401, determined the victim's cracked rib and resultant continuous pain for twenty days was sufficient to satisfy the protracted loss requirement of serious physical injury. Mr. Gray was shot in the thigh, the bullet traveled up his leg and lodged itself in his pelvis. The bullet was left in his body because removal would do more harm than good. It was very painful for Mr. Gray to walk for three weeks after the shooting. He limped very heavily while walking. There is a visible scar where the bullet entered his body. There is no question Mr. Gray suffered physical injury. This court finds an inability to walk without severe pain for three weeks after a gunshot wound is a sufficiently protracted impairment so as to constitute serious physical injury.

There is sufficient evidence to support the trial court's finding that Mr. Pettit attempted to kill or attempted to cause serious physical injury to Mr. Perry and Mr. Watson. Because there is sufficient evidence that Mr. Pettit caused serious physical injury to Mr. Gray and to Mr. Cook, a reasonable juror might have found the defendant guilty of first degree assault and armed criminal action beyond a reasonable doubt. The trial court did not err in denying Mr. Pettit's motion for acquittal. Point III denied.

## POINT FOUR -

### STATE'S CLOSING ARGUMENT DOES NOT WARRANT REVERSAL

■ In his fourth point on appeal, Mr. Pettit contends the trial court erred by overruling Mr. Pettit's objections to the State's

closing argument because the remarks were intended to inflame and prejudice the jury.

The prosecutor made several remarks in closing argument that are challenged on appeal. The prosecutor remarked "What kind of man does it take to shoot two people in a crowded Westport area?" The prosecutor also made four characterizations of the evidence: (1) "At least he (Pettit) admitted ... he was a bad shot."; (2) references to Mr. Pettit's gang affiliation; (3) Mr. Pettit's "popping those six guys in a parking lot."; and (4) "You heard him (Pettit) up on the stand ... talk about all the bar fights, all these guys he got into fights with." The prosecutor made one remark that Mr. Pettit's contention of a reckless shooting was "garbage."

■ Mr. Pettit specifically objected only to the prosecutor's remark, "What kind of man does it take to shoot two people in a crowded Westport area?" The trial court's denial of Mr. Pettit's objection will not be disturbed unless there is a clear abuse of discretion. *State v. Norton,* 949 S.W.2d 672, 677 (Mo.App.1997). To warrant reversal of a conviction for improper closing argument, the defendant must establish that the counsel's improper comments had a decisive impact upon the jury's verdict. *State v. Newlon,* 627 S.W.2d 606, 616 (Mo. banc), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982).

■ The trial court did not abuse its discretion in overruling Mr. Pettit's objection to the prosecutor's remark in closing argument, "What kind of man does it take to shoot two people in a crowded Westport area?" This statement is neither inflammatory on its face nor under the circumstances and context which the remark was made. "Trial counsel may state opinions or conclusions that fairly draw from the evidence, and counsel may draw any inference from the evidence that he believes is justified in good faith." *State v. Martin,* 852 S.W.2d 844, 853 (Mo.App.1992). Mr. Pettit fired four shots at two men in front of the America's Pub, a bar in the Westport district. The fact that two innocent bystanders were struck by errant bullets is evidence of the presence of others in the vicinity of the shooting. The prosecutor's remark was a fair comment on the events that transpired. The trial court's ruling is neither illogical or unreasonable or arbitrary. The trial court did not abuse its discretion in overruling Mr. Pettit's objection.

■ Mr. Pettit failed to object to the other prosecutorial remarks in closing argument that are raised on appeal. Therefore, Mr. Pettit requests plain error review. Plain error is found only when the court determines that "manifest injustice or a miscarriage of justice has occurred." *State v. McMillin,* 783 S.W.2d 82, 95 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). "Relief should rarely be granted on assertions of plain error as to closing argument because, 'in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention.'" *State v. Boyd,* 954 S.W.2d 602, 606 (Mo.App.1997) (quoting *State v. Silvey,* 894 S.W.2d 662, 670 (Mo. banc 1995)). "Plain error relief should be rarely granted as to closing argument, 'for trial strategy looms as an important consideration and such assertions are generally denied without explanation.'" *Boyd,* 954 S.W.2d at 606, (quoting *State v. Cobb,* 875 S.W.2d 533, 537 (Mo. banc 1994)). Mr. Pettit has made no showing that "manifest injustice or a miscarriage of justice has occurred." *McMillin,* 783 S.W.2d at 95. While the State's comments were improper closing argument, there is strong evidence of Mr. Pettit's guilt, so there is no likelihood that the result would be different on retrial. *See State v. Bellew,* 586 S.W.2d 461, 464 (Mo.App.1979). The trial court did not commit plain error in failing to admonish, sua sponte, prosecutor for remarks made in closing argument. Point IV denied.

The judgment of the trial court is affirmed.

All concur.