# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 97-1528

_____

| | | |
|---|---|---|
| George B. Harris, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Michael Bowersox; State of | * | |
| Missouri, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: January 14, 1999
Filed:  July 13, 1999

_____

Before LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

HANSEN, Circuit Judge.

A Jackson County, Missouri, jury convicted George B. Harris of first degree murder and armed criminal action.  Harris was sentenced to die for the crime. Following an unsuccessful motion for postconviction relief, the Supreme Court of Missouri affirmed Harris's conviction and sentence.  See State v. Harris, 870 S.W.2d 798 (Mo.) (en banc), cert. denied, 513 U.S. 953 (1994).  Harris now appeals the district

court's[1] order denying his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (1994). We granted a certificate of appealability as to four of the many grounds Harris raised in the district court. Although our reasoning differs from that of the district court in some respects, we affirm the district court's judgment denying habeas relief.

## I.

The following facts are taken principally from the opinion of the Supreme Court of Missouri. On March 11, 1989, George Bernard "Baby" Harris was on a lucky streak shooting craps. Having some money to spare, Harris agreed to a "pawn" arrangement in which Harris gave another man $500 in exchange for two automatic weapons, namely an Uzi and a .45 caliber Thompson submachine gun. Harris initially placed the guns in the trunk of his car. While returning to the crap game, Harris became worried that someone might steal the guns. Harris asked Michael Taylor to keep the guns for him. Taylor agreed, and Harris proceeded to Taylor's house.

Michael Taylor shared his house with three other men, Rodney Butler, Ross Talliferro, and Stanley "Hank" Willoughby. When Harris arrived at Taylor's house, he handed Willoughby a box containing the machine guns. As Willoughby walked back toward the house, Butler told Willoughby not to bring the guns into the house. Willoughby then handed the box to Cortez and Anthony Taylor, Michael Taylor's younger brothers. Willoughby told Cortez and Anthony to hide the guns near the house. Harris left, and the younger Taylors hid the box under some bushes in the backyard without telling Willoughby the location.

---

[1] The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

2

At around 8:00 p.m. that evening, Harris returned and told Michael Taylor that he wanted his guns. Taylor told Harris he did not know where the guns were stowed, but Harris insisted that he needed his guns immediately. Taylor told Harris to wait for Willoughby to return, and then to ask Willoughby about the guns. Some time later, Harris yelled for Michael Taylor to come downstairs. When Taylor came down, he found several people in his house including Harris, Willoughby, Talliferro, and Jaorlath Potts (also known as Rudi). Harris again asked Taylor for his guns, and Taylor again told Harris to take up the issue with Willoughby. Willoughby explained to Harris that he did not know where Anthony and Cortez Taylor had hidden the weapons. Harris insisted that he wanted the guns immediately, and Willoughby went outside in an effort to locate the weapons. Willoughby could not find the guns and returned about five minutes later. Rodney Butler then took a turn at finding the guns. Sometime during the course of events, Harris was heard to say that he was going to kill Willoughby. Also, sometime that day, Harris told Taylor that he wanted the machine guns to conduct a "ride-by" shooting in retaliation for somebody calling Harris a "punk."

By this point in time most of the people had vacated the living room, only Michael Taylor, Willoughby, and Harris remained. Willoughby told Harris that Harris would have to wait for Anthony and Cortez Taylor to get the guns. Harris again insisted on getting his guns immediately. Willoughby said, "Well, I can't help you." Harris, 870 S.W.2d at 805. Harris then got up from a chair, drew his .41 caliber handgun, and shot Willoughby in the face. Willoughby staggered next door but died before reaching the hospital. In the meantime, Butler located the guns and placed them on the porch at the house next door and ran inside.

Harris took the guns and left, ending up eventually at the apartment of his girlfriend Sabrina Lowe. Taking the handgun and two machine guns with them, Harris and Lowe then went to a bar called the Champagne Lounge. The Supreme Court of Missouri opinion states that Harris told Lowe that he was looking for Rudi (who we know from the record is Jaorlath Potts) and intended to kill him. See id. Our review

3

of Ms. Lowe's testimony reveals that Harris went to the Champagne Lounge to kill a man named Dale. When Harris was unable to find Dale, he went looking for Rudi. On March 13, 1989, Harris, Sabrina Lowe, and two others fled Kansas City in a van, heading east toward St. Louis. The police caught up with Harris during this trip, and arrested him for committing an armed robbery in Columbia, Missouri. The police also found the gun Harris used to kill Willoughby.

A jury convicted Harris of the first degree murder of Willoughby. During the penalty phase, the jury found five aggravating circumstances, and Harris received a death sentence. With the aid of new counsel, Harris filed a motion for postconviction relief pursuant to Mo. Sup. Ct. R. 29.15. The postconviction court denied the motion. On appeal, the Supreme Court of Missouri affirmed Harris's conviction and sentence, and affirmed the denial of postconviction relief. After exhausting his state court options, Harris filed a section 2254 habeas petition in the district court, raising some 17 claims (exclusive of subparts). In an order dated November 6, 1996, the district court denied Harris's petition in all respects. The court found several of the claims were not properly preserved and thus were procedurally defaulted. The court addressed the merits of each preserved claim, but ultimately concluded that none of the claims warranted habeas relief. The district court denied Harris's motion to alter or amend its prior judgment. This appeal followed.

II.

Initially, we address the scope of our appellate review. On March 16, 1998, we entered an order granting Harris a certificate of appealability as to four specific issues. In particular, we limited our review to the following: (1) the constitutionality of the depravity of mind aggravating circumstance instruction used in Harris's case; (2) the constitutionality of Missouri's reasonable doubt instruction; (3) the constitutionality of the admission of evidence concerning Harris's alleged plans to conduct a drive-by shooting, and his going to the Champagne Lounge for the purposes of killing another

4

person; and (4) whether Harris's trial counsel was ineffective for failing to identify, locate, and present the testimony of a potential defense witness named Ben Brown. Despite our prior order, Harris's brief includes issues beyond the scope of our certificate of appealability. Notwithstanding this fact, we limit our appellate review to the issues specified in the certificate of appealability. See Harris v. Bowersox, No. 97-1528, order (8th Cir. May 29, 1998). See also Carter v. Hopkins, 151 F.3d 872, 874 (8th Cir.), cert. denied, 119 S. Ct. 524 (1998). In view of this decision, we deny as moot the state's motion to strike those portions of Harris's brief that raise issues not included in our certificate of appealability. See Carter, 151 F.3d at 874 n.5.

## III.

"In determining whether to grant habeas relief, we review the district court's conclusions of law de novo, and its findings of fact for clear error." Bounds v. Delo, 151 F.3d 1116, 1118 (8th Cir. 1998). Additionally, because Harris filed his habeas petition prior to the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, Pub.L. No. 104-132, 110 Stat. 1214, 1218-21 (Apr. 24, 1996), and to our knowledge Missouri has not yet qualified under 28 U.S.C. § 2261 (1996), we review the state court's factual determinations under the pre-AEDPA standard. See Bounds, 151 F.3d at 1118 n.3. Under that standard, state court fact-findings "are generally presumed correct." Id. at 1118 (citing 28 U.S.C. § 2254(d) (1994)).

A.    Depravity of Mind Aggravating Circumstance Instruction

Under Missouri law, in first degree murder cases for which the death penalty is possible, the jury considers specific statutory aggravating circumstances, see Mo. Rev. Stat. § 565.032.2 (West Supp. 1999), any one of which, if found by the jury, is sufficient to sustain a death sentence. During the penalty phase of Harris's murder trial, the trial court presented the jury with five possible aggravating circumstances based on

§ 565.032.2. The jury found all five circumstances present. We granted a certificate of appealability as to the depravity of mind aggravating circumstance instruction.

Aggravating circumstance number 4, as contained in Instruction 17, reads as follows:

> Whether the murder of Stanley "Hank" Willoughby involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find that the defendant killed Stanley "Hank" Willoughby as a part of defendant's plan to kill more than one person and thereby exhibited a callous disregard for the sanctity of all human life.

(J.A. at 287.) Harris contends that this instruction is unconstitutionally vague. The district court agreed but denied relief, concluding rather that any error was harmless error. As we explain below, while we agree with the district court's harmless error analysis, we do not believe the instruction is unconstitutionally vague.

We agree with the district court's conclusion that Missouri's statutory definition of depravity of mind,[2] standing alone, does not pass constitutional muster. See Sidebottom v. Delo, 46 F.3d 744, 755 (8th Cir.), cert. denied, 516 U.S. 849 (1995). As the district court aptly recognized, however, "a state supreme court may salvage a facially-vague statute by construing it to provide the sentencing body with objective criteria for applying the statute." Mathenia v. Delo, 975 F.2d 444, 449 (8th Cir. 1992) (quotations omitted), cert. denied, 507 U.S. 995 (1993). The district court concluded that a proper limiting construction had not been applied in Harris's case, but denied habeas relief after conducting a harmless error analysis.

---

[2] The statutory depravity of mind aggravating circumstance reads as follows: "The murder in the first degree was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind." § 565.032.2(7).

6

With all due respect to the experienced district court, we conclude that the state court properly limited the instruction by requiring that the jury find a plan to kill more than one person in order to satisfy the depravity of mind instruction. After the district court decided Harris's case, we upheld the validity of a nearly identical instruction in Ramsey v. Bowersox, 149 F.3d 749, 754 (8th Cir. 1998), cert. denied, 119 S. Ct. 1083 (U.S. 1999). In Ramsey, the Missouri court gave "a limiting construction [to the depravity of mind instruction] by instructing the jury it could find depravity if it found [the defendant] . . . planned to kill more than one person, and had a callous disregard for human life." Id. We are bound by Ramsey and therefore conclude that no constitutional error resulted from the depravity of mind instruction used in Harris's case. In fact, during Harris's direct appeal, Missouri's Supreme Court compared the instruction used in Harris's case to the "nearly identical instruction" it had previously found constitutionally sound in Ramsey's case. Harris, 870 S.W.2d at 813 (discussing State v. Ramsey, 864 S.W.2d 320, 328 (Mo. 1993) (en banc)).

Moreover, even assuming that the instruction is unconstitutionally vague, we believe, like the district court, any resulting error is harmless beyond a reasonable doubt. See Williams v. Clarke, 40 F.3d 1529, 1540, 1541 (8th Cir. 1994) (holding that federal appellate courts "are authorized to engage in constitutional harmless error analysis in the first instance" when a state appellate court does not undertake such an analysis, and that such error must be harmless beyond a reasonable doubt),[3] cert.

_____

[3] The United States Supreme Court recently reemphasized the so-called Brecht harmless error standard for use in habeas proceedings. Calderon v. Coleman, 119 S. Ct. 500, 502-03 (1998) (discussing Brecht v. Abrahamson, 507 U.S. 619 (1993)). The Brecht harmless error standard is admittedly lower than the standard we employed in Williams (which reflects Chapman v. California, 386 U.S. 18 (1967)). Under Brecht, an error is harmless unless the court finds "that the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." Coleman, 119 S. Ct. at 504. In Coleman, unlike the present case, the state court had conducted its own harmless error analysis. We need not decide today whether Coleman requires us to abandon the standard articulated in Williams because we

<u>denied</u>, 514 U.S. 1033 (1995).  Missouri is a "nonweighing" state—only one aggravating factor need be present in order to validly impose a death sentence.[4]  <u>See</u> <u>Ramsey</u>, 149 F.3d at 754-55; <u>Sloan v. Delo</u>, 54 F.3d 1371, 1385-86 (8th Cir. 1995), <u>cert. denied</u>, 516 U.S. 1056 (1996).  In Harris's case, the jury found four other, unrelated aggravating circumstances.  In particular, the jury found that Harris had two first degree robbery convictions and one conviction for armed criminal action.  <u>See</u> Mo. Rev. Stat. § 565.032.2(1).  The jury also found that Harris murdered Willoughby for the purpose of receiving something of monetary value.  <u>See</u> <u>id.</u> § 565.032.2(4).  Therefore, even if the depravity of mind instruction used in Harris's case was unconstitutionally vague, the jury's penalty phase verdict is reliable beyond a reasonable doubt because the jury found several other aggravating circumstances.  <u>See</u> <u>Stringer v. Black</u>, 503 U.S. 222, 232 (1992); <u>Ramsey</u>, 149 F.3d at 754-55.

In sum, we conclude that the depravity of mind aggravating circumstance instruction applied in Harris's case is constitutionally sound, and even if it were not, any resulting error is harmless beyond a reasonable doubt.

B.      Missouri's Reasonable Doubt Instruction

Harris also claims that Missouri's reasonable doubt instruction unconstitutionally reduces the standard of proof necessary to support a criminal conviction.  We have recently addressed similar attacks on the Missouri instruction, each time concluding

---

believe the differences between the <u>Brecht</u> standard and the <u>Williams</u> / <u>Chapman</u> standard are inconsequential in Harris's case.  Simply stated, the alleged error is harmless under either standard.

[4] In contrast, a "weighing" state typically requires the decision maker to weigh the aggravating circumstances "against any mitigating circumstances to determine whether the death penalty is justified."  <u>Williams</u>, 40 F.3d at 1535 (discussing Nebraska's weighing statute, Neb. Rev. Stat. § 29-2522).

that such challenges are <u>Teague</u>-barred.[5]  <u>See</u>, <u>e.g.</u>, <u>Ramsey</u>, 149 F.3d at 757-58; <u>Murray v. Delo</u>, 34 F.3d 1367, 1382 (8th Cir. 1994), <u>cert. denied,</u> 515 U.S. 1136 (1995).  Relying on these or similar precedents, the district court declined to entertain the merits of Harris's attack on the instruction.  Before this court, Harris asserts that his claim is not <u>Teague</u>-barred because he bases his challenge on Supreme Court precedent that was established before his conviction became final, namely <u>Victor v. Nebraska</u>, 511 U.S. 1 (1994).  Harris's conviction became final after <u>Victor</u>, when the Supreme Court denied his petition for certiorari.  <u>See</u> <u>Harris v. Missouri</u>, 513 U.S. 953 (1994).  Moreover, contrary to the position taken in its briefs, Missouri conceded at oral argument that Harris's particular challenge is not <u>Teague</u>-barred.  Thus, we will address the merits of Harris's challenge to Missouri's reasonable doubt instruction.

"The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course."  <u>Victor</u>, 511 U.S. at 5.  In assessing the constitutionality of the Missouri instruction, we review the instruction as a whole to determine if it correctly conveys to the jury the concept of reasonable doubt.  <u>Id.</u> (citing <u>Holland v. United States</u>, 348 U.S. 121, 140 (1954)).  As we explain below, we believe the Missouri instruction is constitutionally sound.

Harris's challenge focuses on the use of the words "firmly convinced" to describe the concept of reasonable doubt.  The relevant portion of the instruction used in Harris's case reads as follows:

> Proof beyond a reasonable doubt is proof that leaves you <u>firmly convinced</u> of the defendant's guilt.  The law does not require proof that

---

[5] In <u>Teague v. Lane</u>, a plurality of the United States Supreme Court held that as a general rule, habeas corpus petitioners cannot gain the benefit of a new rule of constitutional procedure unless the rule is dictated by precedent existing at the time the petitioner's conviction became final.  489 U.S. 288, 301, 316 (1989).

overcomes every possible doubt. If, after your consideration of all evidence, you are <u>firmly convinced</u> that the defendant is guilty of the crime charged, you will find him guilty. If you are not so convinced, you must give him the benefit of the doubt and find him not guilty.

(J.A. at 272.) (emphasis added). This standard is substantially similar to a reasonable doubt instruction promulgated by the Federal Judicial Center. In relevant part, that instruction reads:

> "Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. . . . [I]n criminal cases the law does not require proof that overcomes every possible doubt. If, based upon your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty." Federal Judicial Center, Pattern Criminal Jury Instructions, at 17-18 (instruction 21).

<u>Victor</u>, 511 U.S. at 27 (Ginsburg, J., concurring in part and concurring in the judgment).

Several of our sister circuits have endorsed the same or a similar reasonable doubt instruction. <u>See</u>, <u>e.g.</u>, <u>United States v. Brand</u>, 80 F.3d 560, 566 & n.8 (1st Cir. 1996), <u>cert. denied</u>, 519 U.S. 1077 (1997); <u>United States v. Conway</u>, 73 F.3d 975, 980 (10th Cir. 1995); <u>United States v. Williams</u>, 20 F.3d 125, 131-32 (5th Cir.), <u>cert. denied</u>, 513 U.S. 891, 894 (1994). Moreover, in <u>Victor</u>, Justice Ginsburg described the Federal Judicial Center instruction as a "clear, straightforward, and accurate" explanation of reasonable doubt. 511 U.S. at 26.

Harris contends, however, that differences of a constitutional dimension exist between Missouri's instruction and the Federal Judicial Center's instruction. According

to Harris, the Missouri instruction relies solely on the "firmly convinced" language to define reasonable doubt, while the Federal Judicial Center instruction adds clarifying language directing a jury to consider the "real possibility" of innocence. (See Appellant's Br. at 17.) We find the differences between the two instructions insubstantial.

Harris attempts to parse the Missouri instruction and force us to read selected portions in isolation. Yet, as we have already stated, Victor requires us to review the instruction as a whole to determine whether it adequately conveys the concept of reasonable doubt. 511 U.S. at 5. When read as a whole, we believe it is entirely unreasonable to conclude that the Missouri instruction relies solely on the words "firmly convinced" to convey the meaning of reasonable doubt. The Missouri instruction, like the Federal Judicial Center instruction, "has the virtue of using the common phrase 'give him the benefit of the doubt'" in defining reasonable doubt. United States v. Artero, 121 F.3d 1256, 1258 (9th Cir. 1997) (upholding Federal Judicial Center, Pattern Criminal Jury Instruction 21), cert. denied, 118 S. Ct. 1089 (1998). We believe that "[m]ost jurors are likely to have spoken that way themselves, when they mean 'I think something is probably true, but I'm not sure, so I'll give him the benefit of the doubt.'" Id. In short, we find that the state's instruction adequately conveyed the jury's obligation that it could convict Harris only upon finding him guilty beyond a reasonable doubt. That is all that is required. Harris is not entitled to any habeas relief based on the reasonable doubt instruction used in his case.

C.    Bad Acts Evidence

Harris argues that he was deprived of due process of law when the trial court allowed the prosecutor to comment upon and elicit testimony regarding certain uncharged bad acts. The district court concluded that Harris failed to show how any alleged error fatally infected the trial or undermined notions of fundamental fairness. We agree with the district court.

11

"Because questions concerning the admission of evidence are matters of State law, our review of such questions in a habeas corpus proceeding is limited to determining whether the defendant's constitutional rights have been violated." Rainer v. Department of Corrections, 914 F.2d 1067, 1072 (8th Cir. 1990), cert. denied, 498 U.S. 1099 (1991). See also Parker v. Bowersox, 94 F.3d 458, 460 (8th Cir. 1996), cert. denied, 520 U.S. 1171 (1997). Further, there is no due process violation simply because a trial court admits evidence of a defendant's uncharged bad acts. McDaniel v. Lockhart, 961 F.2d 1358, 1360 (8th Cir. 1992). A habeas petitioner

> must show more than error requiring reversal on direct appeal to obtain relief. He must show that the alleged error rendered the entire trial fundamentally unfair—that there is a reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety, the verdict probably would have been different.

Carter v. Armontrout, 929 F.2d 1294, 1296 (8th Cir. 1991) (internal quotations omitted). See also Mercer v. Armontrout, 844 F.2d 582, 587 (8th Cir.) (noting that habeas relief is available only if the alleged error "fatally infected the trial" and deprived the petitioner of "the fundamental fairness which is the essence of due process") (internal quotations omitted), cert. denied, 488 U.S. 900 (1988). In making our fundamental fairness determination, we "review the totality of the facts in the case and the fairness of the whole trial." McDaniel, 961 F.2d at 1360.

The general rule under Missouri law, like most jurisdictions, is that "evidence of uncharged crimes, wrongs, or acts . . . is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes." Harris, 870 S.W.2d at 810 (internal quotations omitted). Also like most jurisdictions, Missouri's rule against propensity evidence is subject to several exceptions. For example, the prosecution may properly submit bad acts evidence that tends to establish "motive, intent, absence of mistake or accident, or a common plan or scheme." Id. at 810. Missouri recognizes an additional exception "for evidence of uncharged crimes that are part of the

12

circumstances or the sequence of events surrounding the offense charged" in order "to present a complete and coherent picture of the events that transpired." Id.

Broadly stated, Harris challenges the admission of evidence relating to (1) his plans to conduct a ride-by[6] shooting on the day he shot Willoughby, and (2) his going to the Champagne Lounge to shoot someone after he shot Willoughby. We address each of these challenges in turn.

### 1. Harris's Plans to Conduct a Ride-By Shooting

It was the state's theory that Harris's eagerness to regain possession of his guns, and his anger with Willoughby for not quickly producing them, stemmed from his desire to conduct a ride-by shooting. Consistent with this theory, during opening statements the prosecutor commented that Harris wanted the machine guns "because someone had called [Harris] a punk, and because of that he was going to ride down on them, and do a drive-by." (Trial Tr. at 588.) As part of its case-in-chief, the state provided evidentiary support to back up its theory of the case. Michael Taylor's testimony on behalf of the prosecution included the following colloquy:

> Prosecutor: Did Baby Harris ever tell you what he wanted these machine guns for?
> Taylor: He said something earlier about that he wanted to do a ride-by, he wanted to show some guys that he wasn't a punk, that they think he was a punk.

(Trial Tr. at 785.)

---

[6] We use the terms "ride-by" and "drive-by" interchangeably. Michael Taylor testified that "[a] ride-by is like when you ride by a certain place, you go by and shoot it up, you know, or shoot them." (Trial Tr. at 787.)

13

It seems clear to us that the evidence of Harris's plans to conduct a ride-by shooting not only completes the picture, as the state court concluded, it also provides a motive for shooting Willoughby. We have discussed similar matters in the context of the Federal Rules of Evidence. <u>See</u>, <u>e.g.</u>, <u>United States v. Phelps</u>, 168 F.3d 1048, 1057-58 (8th Cir. 1999) (finding no abuse of discretion in admitting evidence relating to a defendant's actions before and after a shooting); <u>United States v. Luna</u>, 94 F.3d 1156, 1162 (8th Cir. 1996) (holding that other bad acts evidence was admissible to explain the government's theory of the case, as well as for showing the defendant's motive for participating in an armed robbery); <u>United States v. White</u>, 645 F.2d 599, 602 (8th Cir.) (noting that evidence of other bad acts is admissible when it completes the story of the crime on trial), <u>cert. denied</u>, 452 U.S. 943 (1981). In other words, this evidence had substantial probative value beyond any propensity effect. While our review is limited to constitutional issues, the prosecutor's comments and Michael Taylor's testimony regarding Harris's plans to conduct a ride-by shooting were proper matters for the jury's consideration. Therefore, we do not believe that the trial court transgressed Harris's due process rights by allowing the jury to hear this evidence. Indeed, the evidence was admissible.

2. <u>The Incident at the Champagne Lounge</u>

The prosecution presented the testimony of Harris's former girlfriend, Sabrina Lowe, three times: first during its case-in-chief, then as part of its rebuttal, and again during the penalty phase. During the prosecution's case-in-chief, Ms. Lowe's testimony principally concerned Harris's flight from Kansas City and his eventual capture near Columbia, Missouri. During the defense's case, however, Harris testified on cross-examination: (1) that he never went to Sabrina Lowe's apartment after shooting Willoughby and that Ms. Lowe would have no way of knowing about the machine guns (Trial Tr. at 903, 905); (2) that he never picked up his machine guns before leaving Michael Taylor's house (<u>id.</u> at 902); and (3) that he did not go with Sabrina Lowe to any bar to kill potential witnesses to the Willoughby homicide (<u>id.</u> at 905-07). To rebut

14

Harris's testimony, the prosecution returned Sabrina Lowe to the witness stand.  Ms. Lowe then testified that Harris came to her apartment the night of the Willoughby murder, and that Harris wanted to go to the Champagne Lounge to kill someone.  (Id. at 939.)  She also testified that the two machine guns were in the back seat of the car as they drove to the Champagne Lounge.  (Id. at 940-41.)  According to Ms. Lowe, Harris initially went into the bar but came out and was refused reentry by a bouncer.  (Id.)  At this point, she and Harris went looking for Rudi (Jaorlath Potts) because Harris was mad at Rudi.  (Id. at 941.)

From our reading of the record, it is clear that the prosecution presented Ms. Lowe's additional rebuttal testimony to refute Harris's contention that he never actually picked up the machine guns and never went to Ms. Lowe's apartment.  The legitimacy of this use seems self-evident to us.  It was the state's theory that Harris killed Willoughby because he wanted immediate possession of the machine guns for a ride-by shooting and Willoughby was not producing them fast enough.  Harris testified that he left the crime scene without stopping to pick up his guns, thereby undercutting the state's theory. Ms. Lowe's testimony, therefore, was necessary to rebut Harris's defense. Harris's motion for judgment of acquittal or in the alternative for a new trial virtually concedes the propriety of this line of questioning.  (See State Supreme Court Legal File at 107.)

Additionally, the prosecution presented Ms. Lowe's rebuttal testimony to counter Harris's denial that he went to the Champagne Lounge looking to kill a witness.  When asked whether they went to the bar "so that [Harris] could kill somebody," Ms. Lowe responded, "Yes."  (Trial Tr. at 939.)  It appears to us that the prosecutor properly offered Ms. Lowe's testimony to rebut Harris's claim that he never intended to kill any witness.  The probative value of such evidence is manifest—persons who kill in self-defense desire to preserve eyewitness testimony, not eliminate it.  Upon our review of the totality of the guilt phase testimony, we believe that a reasonable juror could infer that Harris went to the Champagne Lounge to kill a witness to the Willoughby

15

homicide. Only with the benefit of Sabrina Lowe's penalty phase testimony does the strength of such an inference begin to wither.

During the penalty phase, Ms. Lowe testified that she and Harris went to the Champagne Lounge looking for a man named "Dale." The name "Dale" was not used during her guilt phase testimony. Upon our careful review of the entire trial transcript, we believe that Sabrina Lowe's testimony supports the following conclusions regarding the incident at the Champagne Lounge. She and Harris went to the Champagne Lounge looking for a person named Dale, who is apparently not the same person as Rudi (Jaorlath Potts), and who may or may not have been a witness to the Willoughby murder. Harris did not take the machine guns into the bar.[7] Upon being refused reentry, Harris went looking for Rudi, eventually finding, but not killing, him. Although the benefit of hindsight may weaken the tie between the Champagne Lounge and the Willoughby murder, we cannot say that the admission of this arguably improper propensity evidence necessarily means that a constitutional error occurred.

Given the long and celebrated history of the rule against propensity evidence, one might argue that the general rule has constitutional qualities. In the federal context we recently rejected such notions, at least in part. In United States v. Mound, we held that Federal Rule of Evidence 413, subject to the strictures of Rule 403, is constitutional even though Rule 413 allows the prosecution to introduce bad acts evidence during its case-in-chief to show the propensity of sex offenders to commit similar acts. 149 F.3d 799, 800-01 (8th Cir. 1998), cert. denied, 119 S. Ct. 842 (1999). But see United States v. Mound, 157 F.3d 1153, 1153-54 (8th Cir. 1998) (Morris Sheppard Arnold, J., dissenting from the denial of the suggestion for rehearing en banc)

---

[7] It is not clear from Ms. Lowe's guilt phase rebuttal testimony whether Harris physically possessed the machine guns or left them in the car when he approached the Champagne Lounge. (See Trial Tr. at 940.) Her penalty phase testimony is unambiguous—Harris took only a handgun into the bar. (Id. at 1054-55.)

16

(questioning the fundamental fairness of Rule 413 in view of "a centuries-old legal tradition that views propensity evidence with a particularly skeptical eye").

We need not address the larger question of the constitutional status of the general rule against propensity evidence because we find that even assuming it was an error to admit the evidence of Harris's plans to kill someone at the Champagne Lounge, it did not fatally infect either the guilt phase or the penalty phase of Harris's trial. See Mercer, 844 F.2d at 587.

First, the evidence relating to the Champagne Lounge does not cast doubt upon the fundamental fairness of the guilt phase of Harris's trial. We have carefully reviewed the record and believe there was overwhelming evidence of Harris's guilt. All of the elements necessary to prove the crime were met irrespective of Ms. Lowe's testimony regarding Harris's alleged plans to kill someone at a bar. Also, it is important to understand the context surrounding Ms. Lowe's rebuttal testimony, which we have already indicated created a reasonable inference that Harris went to the Champagne Lounge to kill a witness. Finally, no limiting instruction regarding the allegedly improper bad acts evidence was requested. (See Trial Tr. at 949.) We believe, therefore, that Harris would have been convicted even had the allegedly prejudicial evidence regarding the Champagne Lounge been excluded. See Carter, 929 F.2d at 1296 (stating that a petitioner must show "that absent the alleged impropriety, the verdict probably would have been different"). Having considered the totality of the facts, we cannot say that admitting this evidence undermined the fundamental fairness of the guilt phase of Harris's trial. See McDaniel, 961 F.2d at 1360; Mercer, 844 F.2d at 587.

Second, the evidence regarding Harris's plans to kill Dale could not have adversely impacted the penalty phase either. As we explained above, the depravity of mind instruction used in Harris's case was constitutionally sound. The evidence of Harris's plans to conduct a ride-by shooting, which was properly before the jury, was

17

more than enough to allow the jury to find that Harris's conduct met the requirements of that instruction. Similarly, the jury found four other, independent aggravating circumstances. We believe, therefore, that the evidence relating to Harris's plans to kill someone at the Champagne Lounge in no way fatally infected or tainted the penalty phase.

To the extent Harris's arguments invite us to assess the cumulative effects of any perceived evidentiary errors (see Appellant's Br. at 11), we decline the invitation. We have held that each due process claim must stand or fall individually. See Griffin v. Delo, 33 F.3d 895, 905 (8th Cir. 1994), cert. denied, 514 U.S. 1119 (1995); Byrd v. Armontrout, 880 F.2d 1, 11 (8th Cir. 1989), cert. denied, 494 U.S. 1019 (1990). But see Hobbs v. Lockhart, 791 F.2d 125, 128 (8th Cir. 1986) (addressing and then rejecting a section 2254 petitioner's argument that the cumulative effect of admitting other crimes evidence tainted the fundamental fairness of the entire trial).

In summary, having reviewed the totality of the facts, we cannot say that admitting into evidence Harris's plans to conduct a drive-by shooting or his activities with Sabrina Lowe fatally infected the fairness of his trial, thereby depriving Harris of due process of law. McDaniel, 961 F.2d at 1360. Harris bears the burden of showing that some prejudice "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982). Harris has not met that burden. We deny Harris's request for habeas relief based on the admission of this evidence.

D.      Ineffective Assistance of Trial Counsel

We also granted a certificate of appealability on the question of whether Harris's trial counsel was constitutionally deficient in failing to adequately investigate and present the testimony of one Ben Brown. Harris contends that Brown is a disinterested eyewitness who was willing to testify in support of Harris's self-defense theory. For

18

the reasons explained below, we affirm the district court's denial of habeas relief on this ground.

To succeed on a claim of ineffective assistance of trial counsel, Harris must show that his attorney's performance was deficient and that the deficiency prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). "Counsel's performance was deficient if it fell 'outside the wide range of professionally competent assistance.'" Sidebottom, 46 F.3d at 752 (quoting Strickland, 466 U.S. at 690). Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "Further, we must examine the attorney's conduct as of the time of the trial and not view it with the distorting tint of hindsight." Battle v. Delo, 19 F.3d 1547, 1555 (8th Cir. 1994), op. adhered to as modified on recons., 64 F.3d 347 (8th Cir. 1995), cert. denied, 517 U.S. 1235 (1996).

Harris asserts that his trial counsel failed to conduct an adequate pretrial investigation resulting in the failure to present the testimony of Ben Brown. Brown was partially identified in a police report accompanying a statement that Jaorlath Potts gave to investigators. (State Postconviction Legal File at 149.) As documented in that report, Potts identified several witnesses to the Willoughby homicide. The report did not specifically identify "Ben Brown," but rather listed only "Ben, B/M, 15 years of age." We know from Brown's testimony at the state postconviction relief hearing and from an affidavit Brown prepared in 1995 that he would have testified that he saw Willoughby standing over Harris and reaching toward his waist at the time Harris shot and killed Willoughby. (See State Postconviction Tr. at 323-24; J.A. at 192-95.) Brown also claims that after Harris shot Willoughby, Brown was the last person to leave the house and that he saw a black revolver lying on the floor. (State Postconviction Tr. at 324-25.)

19

We first consider the reasonableness of trial counsel's conduct to determine if it fell "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. Trial counsel testified at the postconviction relief hearing, asserting that Harris never informed him about Ben Brown, and that he called every potential witness that Harris mentioned to him. (State Postconviction Tr. at 175, 215.) According to trial counsel, he attempted to contact persons identified in police reports but was not successful, and even the prosecutor experienced difficulty locating witnesses to the Willoughby homicide.[8] (Id. at 178.) Although Harris maintained at his postconviction hearing that he told trial counsel about Ben Brown (see id. at 252), the Missouri courts found that trial counsel was not made aware of Ben Brown's existence. See Harris, 870 S.W.2d at 818. We have carefully reviewed the record and see no reason to conclude otherwise. See 28 U.S.C. § 2254(d). Moreover, we have previously held that "[a] first name, or an incorrect last name, in a police report can hardly be the basis for an ineffective assistance claim when [the defendant] did nothing to assist counsel in locating those who could have helped his defense." Battle, 19 F.3d at 1555.

Harris also maintains that trial counsel should have discovered Ben Brown from the deposition of Jaorlath Potts. In particular, Harris argues that because counsel deposed Jaorlath Potts, and Brown was with Potts at Michael Taylor's house when Harris shot Willoughby, counsel should have discovered Ben Brown. This argument is wholly without merit. It is true that trial counsel deposed Potts,[9] and Potts testified

---

[8] During his opening statement, the prosecutor commented on the presence of Jaorlath "Rudi" Potts and his friends. "[T]here may be some testimony that there were two friends of Rudy Potts there. Who they are, where they are, if they were there at the time of the shooting, we don't know." (Trial Tr. at 593.) (Potts's nickname is spelled three different ways—Rudi, Ruddi, and Rudy—in the various portions of the record.)

[9] Potts testified that he was not deposed until after Harris's trial. (State Postconviction Tr. at 91.) At oral argument, Harris's habeas counsel asserted that the Potts deposition occurred shortly before trial. For the purposes of our analysis, we

20

at the postconviction hearing that Brown was with him at Michael Taylor's house. (State Postconviction Tr. at 84.) Conspicuously missing from Harris's argument, however, is any factual indication that Potts ever informed trial counsel about Ben Brown during his deposition, or that Ben Brown might have additional information that might have furthered Harris's defense. Also missing from Harris's argument is any showing that trial counsel could have located Ben Brown even were he made aware of Brown's existence.

For the foregoing reasons, we find no deficiency in trial counsel's failure to locate Ben Brown and present his testimony at trial. Even were we to assume that trial counsel's investigation was somehow constitutionally deficient, we conclude that any such deficiency did not prejudice Harris because there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

When viewed in light of Harris's own trial testimony, Ben Brown's account of the events is inconsistent and is of only marginal value at best. For example, Brown declared in his affidavit that Willoughby was standing over Harris "waiving his arms around and stuff." (J.A. at 193.) Yet Harris testified that Willoughby was standing on the steps and leaning over Michael Taylor immediately before Harris shot Willoughby. (Trial Tr. at 892, 896, 898.) Brown also stated that he saw a revolver on the floor after the shooting. (J.A. at 194.) Harris, however, testified at trial that he never saw anything other than a gun handle, never saw Willoughby actually hold a gun, and that Willoughby placed his hands to his face upon being shot. (Trial Tr. at 895-96, 908.) No revolver was ever found at the crime scene (see id. at 634-35), nor did any police report mention such a weapon. Nobody else saw any gun other than the one Harris used to kill Willoughby.

---

assume that trial counsel deposed Potts before trial.

21

In fact, trial counsel had no reason to try and locate a second weapon because prior to trial, Harris never told counsel about seeing a gun or any part thereof. Based on what Harris told trial counsel, the entire self-defense theory rested on Harris seeing a fire in Willoughby's eyes, and seeing Willoughby move his hand toward his waist. (See State Postconviction Tr. at 202-03; see also Trial Tr. at 605.)

Having carefully reviewed the trial and postconviction transcripts, we believe that Harris's trial counsel zealously advocated in favor of Harris's defense. We find no deficiency due to trial counsel's failure to investigate Ben Brown. Even assuming that trial counsel's performance was deficient with respect to investigating Ben Brown, we find no prejudice. Inconsistencies and similar evidentiary weaknesses leave us unable to say that a reasonable probability exists that but for trial counsel's alleged failure to adequately investigate Brown, the result of Harris's trial would have been different. See Strickland, 466 U.S. at 694. We deny Harris's request for habeas relief on the basis of ineffective assistance of counsel.

IV.

Having considered all grounds on which we granted a certificate of appealability, we now affirm the district court's judgment denying Harris's petition for a writ of habeas corpus.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

22